# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RACHEL BUTRIM,** *et al.* | * |
| **Plaintiffs** | * |
| **v.** | *    **Civil Action No.: 1:25-cv-00796-MJM** |
| **MAYOR AND CITY COUNCIL** | * |
|   **OF BALTIMORE** | |
| | * |
| **Defendant** | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs, through their undersigned counsel, submit this Opposition to the Defendant's Motion to Dismiss (ECF 11), which the Court should deny for the reasons stated herein.

Respectfully submitted,

Dated:    May 12, 2025

_____

**Allen E. Honick, Esquire, #19822**
**Dustin C. Furman, #19986**
**FURMAN | HONICK LAW**
11155 Red Run Boulevard, Suite 110
Owings Mills, Maryland 21117
(410) 844-6000 – Office
(410) 705-5651 – Facsimile
allen@fhjustice.com
***Counsel for Plaintiffs***

_____/s/ Kevin Stern_____

**Kevin Stern, #29869**
**Daniel Miller, #29862**
MILLER STERN LAWYERS, LLC
2800 Quarry Lake Drive, Suite 280
Baltimore, MD 21209
Telephone: (410) 529-3476
Facsimile: (410) 529-2450
dan@millersternlawyers.com
kevin@millersternlawyers.com
***Counsel for Plaintiffs***

_____/s/ Kenneth Berman_____

**Kenneth Berman, #08529**
BERMAN, SOBIN, GROSS, LLP
481 N. Frederick Avenue, Suite 300
Gaithersburg, MD 20877
Telephone: (301) 670-7030
Facsimile: (301) 670-9492
kberman@bsglaw.com
***Counsel for Plaintiffs***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... i

I.  INTRODUCTION ........................................................................................... 1

II.  LEGAL STANDARD ..................................................................................... 3

   A.  MOTION TO DISMISS ............................................................................. 3

III.  ARGUMENT ................................................................................................ 3

   A.  DELIBERATE INDIFFERENCE IS THE PROPER DEGREE OF CULPABILITY TO DETERMINE IF THE CITY'S CONDUCT SHOCKS THE CONSCIENCE ......................................................... 3

     1.  The City's Formal Written Policy Misrepresented the Existence of Code X-Ray ......... 4

     2.  The City's Repeated Affirmative Assurances Codified the Misrepresentation ............. 6

     3.  The City's Misrepresentations Created a Duty of Disclosure, which Presents the "Special Circumstances" Contemplated in Waybright ........................................................... 7

     4.  "Intent to Harm" is Not the Only Degree of Culpability that Shocks the Conscience in Municipal Employment ................................................................................. 9

     5.  This Case Presents Unique Facts Unlike Any Prior Fourth Circuit Case ..................... 10

     6.  Slaughter is Flawed.................................................................................. 13

   B.  PLAINTIFFS SUFFICIENTLY ALLEGE A STATE-CREATED DANGER SUBSTANTIVE DUE PROCESS VIOLATION ......................................................................................... 16

     1.  The City's Affirmative, Deceptive Conduct Created or Increased the Risk ................. 16

     2.  The City's Conduct Shocks the Conscience .............................................. 16

   C.  PLAINTIFFS DO NOT CONCEDE THAT RULE 9(B) APPLIES—BUT EVEN IF IT DOES, THE ALLEGATIONS SATISFY ITS PARTICULARITY REQUIREMENT ...................................... 18

     1.  Plaintiffs Sufficiently Allege Fraudulent Statements Attributed to the City................. 19

   D.  PLAINTIFFS PLAUSIBLY ALLEGE A MONELL CLAIM......................................... 20

   E.  STATE LAW CLAIMS ARE NOT PREEMPTED BY THE MARYLAND WORKERS' COMPENSATION ACT 22

     1.  Constitutional Claims Are an Exception to the Workers' Compensation Acts' "Exclusivity Rule" ........................................................................................... 22

2.    Assuming, Solely Arguendo, that § 1983 Claims Do Not Preempt Maryland's Workers' Compensation Act's "Exclusivity Rule," § 9-509 Does Not Apply to Either the § 1983 Claims or the State Claims of Plaintiffs Yolanda Butrim, Lacey Marino, Jerry Norman, and Gloria Lacayo Since § 9-509 Only Bars Suits by "Covered Employees" or "Dependents," and None of These Four Plaintiffs Are Either....................................................................... 24

3.    Exclusivity Would Unconstitutionally Deny Plaintiffs Yolanda Butrim, Lacey Marino, Jerry Norman, and Gloria Lacayo the "Right to a Remedy" Guaranteed by the Maryland and United States Constitutions ........................................................................................ 28

4.    While Certain Restrictions May Pass Muster, Complete Denial of Any Remedy Violates Article 19 of the Maryland Constitution and the United States Constitution ........ 30

**Cases:**

*Anderson v. Caldwell County Sheriff's Office*, 524 Fed. App'x 854 (4th Cir. 2013) ...................21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................3

*Askew v. HRFC, LLC*, 810 F.3d 263 (4th Cir. 2016) ...........................................................25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................3

*Board Of Ed. v. Marks-Sloan*, 428 Md. 1, 14 (2012) .........................................................26

*Brager v. Friedenwald*, 128 Md. 8 (1916) ..........................................................................8

*Briscoe v. Potter*, 355 F. Supp. 2d 30 (D.D.C. 2004) ..............................................10, 11, 13

*Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003) ...................................................15

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) ................................................................21

*City of Sacramento v. Lewis*, 523 U.S. 833 (1998) ..........................2, 9, 11, 12, 13, 14, 15, 16, 17

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ........................................9, 14, 21

*Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421 (4th Cir. 2007) .............21

*Damico v. California*, 389 U.S. 416, 417, 88 S. Ct. 526, 19 L. Ed. 2d 647 (1967) ....................22

*Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) ........................................................................16

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) .....................3

*Elsberry v. Stanley Martin Cos.*, LLC, 482 Md. 159, 189 (2022) .................................................26

*Estate of Smith v. Marasco*, 430 F.3d 140 (3d Cir. 2005) ...........................................................15

*Finch v. Hughes Aircraft Co.*, 57 Md. App. 190 (1984) .............................................................8

*Gomez v. Toledo*, 446 U.S. 635, 639, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980) ........................22

*Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999) ..................................................................21

*Griesi v. Atlantic General Hosp. Corp.*, 360 Md. 1 (2000) ......................................................7

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) ..............................................................15

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) ................11, 18, 19

*Hayfield Northern R. Co., Inc. v. Chicago & North Western Transp. Co.*, 467 U.S. 622 (1984) .23

*Hutchings v. Erie City and County Library Bd. of Dir.*, 516 F. Supp. 1265 (W.D. Pa.1981) .......23

*Jacome de Espina v. Jackson*, 442 Md. 311 (2015) ..............................................................30

*Jackson v. Dackman Co.*, 422 Md. 357, 378-379 (2011) .................................................29, 30

*Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994) ...............................................21

*Lead-Off Management, Inc. v. Congo Brands Holding Co., Inc.*, 2025 WL 958779 (D. Md. March 31, 2025) ..................................................................................................................19

*Lisby v. Henderson*, 74 F.4th 470 (7th Cir. 2023) ........................................................15

*Lubore v. RPM Associates, Inc.*, 109 Md. App. 312 (1996) ...........................................8

*Matthews v. Bergdorf*, 889 F.3d 1136 (10th Cir. 2018) .................................................15

*McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551 (4th Cir. 2013) ...................20

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ....................................20

*Monroe v. Pape*, 365 U.S. 167 (1961) ...........................................................................22

*Morin v. Moore*, 309 F.3d 316 (5th Cir. 2002) ..............................................................15

*Mylan Laboratories, Inc. v. Akzo*, N.V., 770 F. Supp. 1053 (D. Md. 1991) ................19

*New River Electrical Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.4th 213 (4th Cir. 2022) ......................................................................................................20

*Nix v. Franklin Co. School Dist.*, 311 F.3d 1373 (11th Cir. 2002) ................................15

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014) ........22

*Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005) ..............................................................15

*Petry v. Prosperity Mortg. Co.*, 758 F.3d 543 (4th Cir. 2014) ......................................25

*Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) ..........................................................16

*Piselli v. 75th St. Med., P.A.*, 371 Md. 188 (2022) ........................................................28

*Polanco v. City of Austin*, 76 F.4th 920 (5th Cir. 2023) ................................................14

*Prince v. Sears Holdings Corp.*, 848 F.3d 173 (4th Cir. 2017) .....................................24

*Rivera v. Rhode Island*, 402 F.3d 27 (1st Cir. 2005) .....................................................15

*Robertson v. Wegmann*, 436 U.S. 584 (1978) ................................................................23

*Rosa v. Cantrell*, 705 F.2d 1208, 1220–21 (10th Cir. 1982) ........................................23

*Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279 (D.S.C. 1999) .........................................20

*Schrader v. Brooks*, 150 Md. 52 (1926) ..........................................................................8

*Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700 (4th Cir. 2007) ..........3

*Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir. 1993) .........................24

*Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023) .............................................................21

*Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317 (4th Cir. 2012) ..........3, 10, 14, 17

*Smith v. Clark/Smoot/Russell*, 796 F.3d 424 (4th Cir. 2015) ........................................20

*State v. Enriquez*, 327 Md. 365, 373 (1997) ..................................................................28

*Stephens v. City of Albemarle*, No. 3:04CV00081, 2005 U.S. Dist. LEXIS 56852 (W.D. Va. Aug. 26, 2005) ..................................................................................................................24

*Terrell v. Larson*, 396 F.3d 975 (8th Cir. 2005) ........................................................15

*Triax, Inc. v. Tforce Freight, Inc.*, No. 1:22-cv-01693-JRR, 2023 U.S. Dist. LEXIS 23446 (D. Md. Feb. 11, 2023)..................................................................................................24

*Vearling v. Bensalem Twp. Sch. Dist.*, Civil No. 94-7711, 1997 U.S. Dist. LEXIS 3103 (E.D. Pa. Mar. 17, 1997)..................................................................................................23

*Walker v. Rowe*, 535 F. Supp. 55, 57 (N.D. Ill. 1982) ...............................................23

*Washington v. Housing Authority of Columbia*, 58 F.4th 170 (4th Cir. 2023)............12, 13, 16, 22

*Waybright v. Frederick County*, 528 F.3d 199 (4th Cir. 2008) .............2, 6, 7, 9, 10, 14, 15, 17, 21

*Weisman v. Connors*, 312 Md. 428 (1988) ................................................................7

*Williams v. Morgan State Univ.*, 484 Md. 534, 546 (2023).........................................25

*Woodward v. City of Worland*, 977 F.2d 1392 (10th Cir. 1992) .................................15

**Statutes:**

29 U.S.C. § 1132(a) (ERISA § 502(a))..........................................................................29

42 U.S.C. § 1983 ...........................................................................27, 29, 30, 33

Md. Code, Cts. & Jud. Proc. § 3-904(e) (Maryland Wrongful Death Act)................................27

Md. Code, Lab. & Empl. § 9-509 (Maryland Workers' Compensation Act) .24, 25, 26, 27, 28, 29, 30

77 Pa. Cons. Stat. Ann. § 481 (Pennsylvania Workers' Compensation Act)................................23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **RACHEL BUTRIM,** *et al* | * | |
| **Plaintiffs** | * | |
| **v.** | * | **Civil Action No.: 1:25-cv-00796-MJM** |
| **MAYOR AND CITY COUNCIL** | * | |
| **OF BALTIMORE** | * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Plaintiffs, through their undersigned counsel, respectfully oppose Defendant Mayor and City Council of Baltimore's (the "City") motion to dismiss (ECF 11), and state in support:

### I.    INTRODUCTION

This case concerns an unparalleled tragedy: the preventable deaths of three Baltimore firefighters and the severe injury of another. But for the City's decade-long deception as to the existence of a life-saving safety program—Code X-Ray—designed to protect first responders from collapsing structures, this tragedy would not have occurred. The City discontinued Code X-Ray and then concealed Code X-Ray's discontinuation from its firefighters. The City thus altered the material terms of the firefighters' employment, unbeknownst to the firefighters, but maintained the illusion that Code X-Ray remained operational. This misrepresentation denied Plaintiffs the opportunity to make an informed decision about their employment and, indeed, created a foreseeable and heightened fatal danger that no reasonable firefighter would have voluntarily accepted. Thus, Plaintiffs' employment was not voluntary in any constitutionally meaningful sense.

The City's misrepresentation about Code X-Ray set in motion a custom and practice of pretending that the program existed, which the City condoned, and the Plaintiffs believed. In so doing,

the City created the illusion of a voluntary employment relationship—but sold a promise, delivered a trap, and called it a job. The City's conduct forms the "special circumstances" contemplated by the Fourth Circuit in *Waybright v. Frederick County*,[1] which places the City's conduct in the "middle range" of the substantive due process continuum under *City of Sacramento v. Lewis*.[2] As such, this case does not fall under the narrow "intent to harm" standard reserved for truly voluntary employment situations.

The Constitution does not permit a government employer to expose its employees to a lethal risk under false pretenses and then escape liability by invoking the voluntariness of their public service. In other words, when the government, with ample time to deliberate, misleads its employees as to the existence of safety protocols and practices, and instead exposes them to life-threatening known hazards, the law does not presume the employees consented to those hazards, nor does it insulate municipal liability behind the "intent to harm" threshold. Accordingly, under binding Fourth Circuit precedent, the appropriate conscience-shocking standard here is deliberate indifference, *i.e.*, whether the City consciously disregarded a serious known risk.

Plaintiffs plausibly allege that the City, through formal policies and long-standing practices, actively misled or knowingly permitted firefighters to rely on a life-saving protocol <u>that the City discontinued</u>, perpetuated a false safety framework, and dispatched firefighters into known death traps. This is the definition of deliberate indifference to a known risk that the City created through its longstanding policies, customs, and affirmative acts. The Court should deny the Motion accordingly.

---

[1] 528 F.3d 199 (4th Cir. 2008).
[2] 523 U.S. 833 (1998).

## II.   LEGAL STANDARD

### A.   Motion to Dismiss

A complaint will survive a Rule 12(b)(6) motion if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (cleaned up).

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont*, 637 F.3d at 448. The court may consider such a document, even if it is not attached to the complaint, if the document "was integral to and explicitly relied on in the complaint," and there is no authenticity challenge. *Id.* (quotation omitted). *See also Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("We may consider documents attached to the complaint . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.").

## III.   ARGUMENT

### A.   Deliberate Indifference is the Proper Degree of Culpability to Determine if the City's Conduct Shocks the Conscience

The City argues that Plaintiffs must allege an "intent to harm" to state a claim under the state-created danger doctrine, citing *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317 (4th Cir. 2012). Even if, *arguendo*, intent to harm was the correct constitutional standard for municipal employment substantive due process claims, it applies only in the "voluntary employment context." *Id.* at 322. This case is fundamentally different.

Here, the City implemented Code X-Ray to protect firefighters from structurally compromised buildings. After prior line-of-duty casualties, Code X-Ray was not just a policy—it was a material term of employment, and a crucial layer of protection designed to flag buildings that had previously collapsed or been deemed unsafe. Firefighters relied on its existence as a life-critical safety system embedded into their standard operating procedures and their daily risk assessments by Departmental Order.

Yet, the City quietly discontinued the program, but continued to affirm its existence through written orders, affirmative misrepresentations, and operational silence. Dispatch communications continued to reference Code X-Ray as if it remained in effect, reinforcing the illusion that unmarked buildings had been screened and deemed structurally sound. This misrepresentation persisted for over a decade, misleading the Plaintiffs about the material terms of their employment, making their exposure to enhanced life-threatening risks unwitting rather than voluntary, and preventing them from acting to preserve their own safety.

The collapse at 205 South Stricker Street was not an anomaly. Plaintiffs allege that this building had previously collapsed on firefighters, making it precisely the type of structure Code X-Ray was designed to flag. The City knew this but allowed the building to go unmarked. Plaintiffs were dispatched under the false assurance that Code X-Ray was still operational and applicable, and they entered the building unaware of the enhanced, deadly risk. This is conscience-shocking deliberate indifference.

### 1.   The City's Formal Written Policy Misrepresented the Existence of Code X-Ray

Since 2010, the City knew that certain structurally compromised condemned properties posed a severe risk of injury or death to the community, especially Baltimore firefighters. *See* Compl. (ECF 13-2) ¶ 17. Over that time, numerous federal agencies directed the City to mark and catalog these dangerous properties to prevent firefighters from entering—the risk of injury or death from a collapse

was simply too high. *Id.* ¶¶ 17–20, 26–29, 55–56. The City knew that firefighters, including the Plaintiffs, could not discern whether a building was structurally compromised without a marking system (¶¶ 21, 32).

In 2010, the City, by Departmental Order, created the Code X-Ray program to "reduce the risk" of "injury and death posed by a serious known threat: <u>Unsafe Vacant Buildings</u>." *See* Compl., Ex. 1 (ECF 13-2) at p. 23. Under the program, unsafe structures were to be conspicuously marked, dispatchers were to alert firefighters responding to any marked building, and firefighters were to use "Exterior Operations Only" when fighting the fire. *Id.*

Yet, in 2011, the City circulated an internal "Operations Memo" advising that Code X-Ray had run out of money and supplies. *Id.* at p. 25. Disturbingly, the City withheld this information from its firefighters and continued acting as if the program was still in effect by never rescinding the Departmental Order establishing the program, which hung in firehouses across Baltimore. *See id.* at pp. 23, 25. According to the Board of Inquiry investigative report, the

> program was never officially shuttered. Therefore, members in the field continued to use the term, 'Code X-Ray' when referring to an unsafe vacant building. Fire Communications Bureau also continued to acknowledge the Code X-Ray designation and made the 'Exterior Only Operations' announcement.
>
> *Id.* at p. 25.[3]

Thus, the City knowingly maintained a written policy conveying false information to firefighters by Departmental Order. This objective misrepresentation distinguishes this case from every previous Fourth Circuit municipal employment claim and could, by itself, create the "special

---

[3] Notably, after the subject fire, Baltimore news outlets confirmed that the Code X-Ray program "quietly ended" in 2012, corroborating the allegations that the City maintained the program's continued existence to its firefighters. https://www.baltimoresun.com/2022/06/15/baltimores-vacant-homes-burn-at-twice-the-national-rate-but-gaps-in-records-systems-limit-what-firefighters-know-before-going-inside/. *See also* https://www.firerescue1.com/legislation-funding/baltimore-officials-fund-only-1-safety-issue-after-death-of-firefighters (confirming Code X-Ray "informally ended around 2012").

circumstances" contemplated by the *Waybright* court. However, the City's misconduct did not stop here.

### 2. The City's Repeated Affirmative Assurances Codified the Misrepresentation

The City did far more than simply misrepresenting the existence of Code X-Ray through its written Departmental Order. In 2012, "upper-level administrators were aware that the program had been effectively discontinued," but "this information was not conveyed to operational personnel." *See* Declaration of Lt. Joseph DiRusso, attached as **EXHIBIT 1**, at ¶ 1(C), and Declaration of Matthew Coster, attached as **EXHIBIT 2**, at 1(C).[4] Thus, firefighters "operated under the reasonable belief that Code X-ray remained part of the department's standard response protocols, unaware that it had been 'quietly discontinued.'" *Id.* ¶ 1(D). That belief was reasonable because the Code X-Ray Departmental Order "continued to be referenced, posted, or otherwise disseminated to firefighters after 2012." *Id.* ¶ 2(A).

Indeed, there "is no record that the directive was ever formally rescinded." *Id.* ¶ 2(B). The City's doublespeak "created the impression among personnel that Code X-Ray remained in effect, despite the department's internal decision to cease its use." *Id.* ¶ 2(D). The City maintained this practice from 2012 through the subject fire, never telling firefighters of Code X-Ray's "inactive status." *Id.* ¶ 4(A). Accordingly, "Rank and file Firefighters who joined the department well after the initial discontinuation were informed that Code X-ray remained an operational protocol." *Id.* ¶ 4(B).

In 2015, for example, a fire academy instructor "specifically informed" Plaintiff McMaster "of the existence of the 'code x-ray' program used to mark vacant structures." *See* Declaration of John McMaster, attached as **EXHIBIT 3**, at ¶ 2. And in 2017, a City fire lieutenant "again advised of the [program's] existence." *Id.* ¶ 3. Plaintiff McMaster avers, "The City maintained at all relevant times

---

[4] Fire Lieutenant DiRusso has been a Baltimore firefighter since 2007 and was promoted to lieutenant in 2015. Mr. Coster has been a Baltimore firefighter since 2002, and is currently the President of the Baltimore Firefighters Union | AFF Local 734.

that the Code X-Ray program was in full effect." *See* Compl. Ex. 1 (ECF 13-2) ¶ 5. Had Plaintiff

McMaster known that Code X-Ray was discontinued, he "would have resigned as a Baltimore City

firefighter." *Id.* ¶ 10. Moreover, the surviving family members of deceased firefighters Butrim, Lacayo,

and Sadler similarly aver that their loved ones "would have resigned" if they knew the City had

discontinued the Code X-Ray program. *See* Declarations of Rachel Butrim, Gloria Lacayo, Brandon

Sadler, Jerry Norman, and Lacey Marino, attached as **EXHIBITS 4, 5, 6, 7, AND 8**, respectively.

### 3. The City's Misrepresentations Created a Duty of Disclosure, which Presents the "Special Circumstances" Contemplated in *Waybright*

Maryland courts have long held that in "the context of an employment relationship, ... an

employer may be obligated to exercise reasonable care in making representations to a prospective

employee during pre-employment negotiations." *Griesi v. Atlantic General Hosp. Corp.*, 360 Md. 1,

15 (2000) (citing *Weisman v. Connors*, 312 Md. 428, 449 (1988)). This is because "the employer-

employee relationship is a business transaction, where a special relationship may develop giving rise

to a duty to exercise reasonable care in facilitating the transaction." *Griesi*, 360 Md. at 15–16; *see also*

*id.* at 16 ("an employer reasonably should foresee that negligent misrepresentation of employment

information may result in economic harm to the prospective employee.").

Importantly, Maryland courts have not restricted this principle to "employment contexts

involving high-level executives or to fixed term employment contracts." *Griesi*, 360 Md. at 17. Rather,

the real focus is "on the importance of the accurate exchange of information in light of the relationship

and the nature of the harm that could result from the defendant's negligence." *Id.* at 18 – 19 (quoting

*Lubore v. RPM Associates, Inc.*, 109 Md. App. 312, 330 (1996)).

Even absent an affirmative duty to disclose, "One who conceals facts that materially qualify

affirmative representations may be liable for fraud." *Lubore*, 109 Md. App. at 330 (1996) (citing *Finch*

*v. Hughes Aircraft Co.*, 57 Md. App. 190, 239 (1984)):

concealment may amount to fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.

*Id.* at 330 (quoting *Schrader v. Brooks*, 150 Md. 52, 57–58 (1926)).

Thus, while "mere silence is not actionable ... if what is stated amounts to a 'partial and fragmentary' disclosure, that misleads because of its incompleteness, the 'legal situation is entirely changed.'" *Id.* at 330–31 (quoting *Brager v. Friedenwald*, 128 Md. 8, 31–32 (1916); *see also* Prosser & Keeton, LAW OF TORTS § 106, at 738 (1984) ("if the defendant does speak, he must disclose enough to prevent his words from being misleading...."); RESTATEMENT (SECOND) OF TORTS § 551, cmt. g ("A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not.... When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.").

Here, the Complaint alleges that the City falsely presented Plaintiffs "with a partial or fragmentary representation, which was rendered misleading by virtue of the importance of the missing or omitted facts" such that the City "owed a duty of disclosure." *Lubore*, 109 Md. App. at 331. The City breached that duty of disclosure and reinforced its concealment through affirmative misrepresentations on which the Plaintiffs detrimentally relied. *See generally* Exs. 1 and 2.

Accordingly, under an "exact analysis of the circumstances presented"—especially at the pleadings stage—Plaintiffs have sufficiently alleged the "special circumstances" where deliberate indifference is the correct degree of culpability to decide whether the City's conduct shocks the conscience. *Waybright*, 528 F.3d at 205 (citing *County of Sacramento v. Lewis*, 523 U.S. at 850).

### 4. "Intent to Harm" is Not the Only Degree of Culpability that Shocks the Conscience in Municipal Employment

Although the Supreme Court in *Collins* affirmed the dismissal of Collins' § 1983 claim, it expressly rejected the Fifth Circuit's reasoning that Collins' status as a municipal employee foreclosed his claim. *See Collins*, 503 U.S. at 120. The Court held that § 1983 does not require a separate showing of abuse of governmental power. *Collins*, 503 U.S. at 119. In so holding, the Court made clear that Collins' status as a city employee did not affect the merits of his § 1983 claim:

> **Neither the fact that Collins was a government employee nor the characterization of the city's deliberate indifference to his safety** as something other than an "abuse of governmental power" **is a sufficient reason for refusing to entertain petitioner's federal claim under § 1983**.

*Id.* at 119–20 (emphasis added).

The Court rejected Collins' claim <u>not</u> because he was a municipal employee, but rather because he had <u>not alleged affirmative conduct</u>, *i.e.*, <u>only</u> that the city <u>failed</u> to provide a reasonably safe work environment. *Id.* at 127; *see also id.* at 125 ("Petitioner does not claim that the city or any of its agents deliberately harmed her husband," and did "not even allege that his supervisor … knew or should have known that there was a significant risk that he would be injured."). Accordingly, under *Collins* and its progeny,[5] a municipal-employee plaintiff sufficiently pleads a § 1983 substantive due process claim when they allege deliberate affirmative municipal conduct that creates or increases the risk of constitutional harm.

Although courts must still "proceed with 'self-restraint' and 'utmost care,'" the Supreme Court and the Fourth Circuit have expressly held that deliberate indifference can shock the conscience in the municipal employment setting. *See Waybright*, 528 F.3d at 205 (quoting *Collins*, 503 U.S. at 125) (describing "special circumstances" where deliberate indifference can shock the conscience). In *Slaughter*, Judge Wynn authored a concurring opinion criticizing the heightened "intent" standard as

---

[5] *See infra* n. 6.

"contrary to the Supreme Court's decision [in *Lewis*] to conclude that in the absence of a custodial relationship, only conduct 'intended to harm' is sufficient to state a claim under § 1983." *Slaughter*, 682 F.3d at 324. Judge Wynn reminded the majority that "government employees are not categorically excluded from claiming deliberate indifference as a basis for Due Process claims," urging the "judicial discretion prescribed by *Lewis* [necessary] to determine whether the City's alleged conduct was 'conscience-shocking.'" *Id.* at 325–26.

### 5. This Case Presents Unique Facts Unlike Any Prior Fourth Circuit Case

Unlike any prior Fourth Circuit case, Plaintiffs allege plausible facts that change the nature of their employment relationship to something less than voluntary in the constitutional sense. The City argues that this case is like *Waybright*, *Slaughter*, and *Cunningham*, but those cases presented truly voluntary relationships with no allegations of deliberate misrepresentations regarding the material terms of employment.

A more apt comparison is *Briscoe v. Potter*, 355 F. Supp. 2d 30 (D.D.C. 2004). In *Briscoe*, postal employees brought a § 1983 action alleging substantive due process claims against their supervisors who provided misleading information, and failed to provide accurate information, about the safety of a facility they knew was contaminated with Anthrax. *Id.* at 37. Although the district court ultimately dismissed the claim under the qualified immunity doctrine, it specifically held that the postal employees sufficiently alleged a state-created danger due process violation under the deliberate indifference measure of culpability. *Id.* at 44–47.

The *Briscoe* court found that plaintiffs satisfied the affirmative act requirement by alleging "a series of actions which intentionally misled Plaintiffs into believing the facility was safe and prevented them from acting to preserve their own safety." *Id.* at 45. The court found the conduct conscience-shocking, applying the deliberate indifference measure, and noting that *Lewis* "did not limit situations

in which deliberate indifference can shock the conscience solely to the context of state custody." *Id.* at 46.

> Defendants engaged in a campaign of misinformation designed to keep the employees at work. As noted by the Supreme Court in *Lewis*, 'when opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.'
>
> *Id.* (quoting *Lewis*, 523 U.S. at 844).

Notably, Rule 9 was not raised or mentioned in *Briscoe*. In other words, *Briscoe* stands for the (persuasive) proposition that in a § 1983 action, a municipal employee plaintiff satisfies Rule 8(a) by alleging an intentional misrepresentation that forms the basis for the constitutional violation. Plaintiffs contend they have satisfied Rule 8(a) under any standard, given the nature of the systemic conduct alleged, the depth of harm directly caused, and the likelihood that discovery will yield admissible evidence to bring Plaintiffs' plausible claims before a jury. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (noting the purpose of Rule 9(b) is to "ensure[ ] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of" (cleaned up)).

Another more apt comparison is the Fourth Circuit's recent decision in *Washington v. Housing Authority of Columbia*, 58 F.4th 170 (4th Cir. 2023). In *Washington*, a tenant in a public housing complex died from carbon monoxide poisoning after the Housing Authority had years to address obvious safety deficits. *Id.* at 175. Officials determined that the "death was entirely preventable had the Housing Authority performed regular maintenance." *Id.* The tenant's estate brought a § 1983 claim against the Housing Authority, alleging substantive due process and *Monell* claims; specifically, "the Housing Authority caused this constitutional violation by acting with deliberate indifference through several policies and customs and by failing to train its employees." *Id.* at 176. The district court dismissed the complaint for failure to state a claim, and the Fourth Circuit reversed. *Id.* at 184.

The Fourth Circuit noted that "deliberate indifference is the correct standard" because "[u]nlike cases involving emergency, split-second decisions, Plaintiff alleges years of choices by the Housing Authority that led to the tragic circumstances of this case." *Id.* at 178. Those choices—ignoring repeated repair requests and applying a mandatory carbon monoxide detector policy only to privately owned properties—"show there was ample time to deliberate and reflect" that such "life-threatening conditions ... threatened *all* of its properties." *Id.* (emphasis in original). The *Washington* court concluded that "Plaintiff has alleged enough facts at this early stage to establish that the Housing Authority recognized the risk of carbon monoxide poisoning and acted inappropriately in light of that risk." *Id.* at 179. The court pointed to the Housing Authority policy that "*expressly acknowledged* that a missing or inoperable carbon monoxide detector ... constitute[s] life-threatening conditions," which "demonstrated that it knew the risk of harm." *Id.* (quotation omitted) (emphasis in original).

The *Washington* court explained that deliberate indifference was the correct measure because "officials had time to reflect on their actions," from 2012 to 2019, so "actual deliberation [wa]s practical." *Id.* at 178.

> We only employ this standard where the official has the 'luxury … of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.'
>
> *Id.* (quoting *Lewis*, 523 U.S. at 853).

In sum, *Washington* stands for the proposition that when the government knows of a serious risk to life and has time to avert it, but deliberately disregards that risk, its conduct can "shock the conscience" without showing a specific intent to harm. Here, as in *Washington*, the City had ample time—more than a decade—to "make unhurried judgments, upon the chance for repeated reflection." *Washington*, 58 F.4th at 178. And here, as in *Briscoe*, the City "engaged in a campaign of

misinformation designed to keep the employees at work," where "actual deliberation was practical." *Briscoe*, 355 F. Supp. 2d at 46.

Although *Washington* involved a tenant, not a municipal employee, its reasoning should apply here with equal force, as it underscores that deliberate indifference is the appropriate measure when the government, with ample time and knowledge, disregards known life-threatening hazards. Here, as in *Washington*, the City had clear knowledge of a deadly hazard with ample time to act. Far from a split-second decision, the City had years to correct its misrepresentations about Code X-Ray, and to mark or secure 205 Stricker Street. Yet, as alleged, the City maintained its misrepresentation for more than ten years. This is analogous to the government's misrepresentations in *Briscoe* and the Housing Authority's willful neglect in *Washington*. Accordingly, the City's conscious disregard of known life-threatening risks, coupled with its prolonged misrepresentation, presents the "special circumstances" acknowledged in *Waybright* and distinguishes this case from *Slaughter* and its progeny of truly voluntary employment cases.

### 6. *Slaughter* is Flawed

Indeed, "voluntary employment" is the only reason the *Slaughter* court identified when holding that "intent to harm" is required to shock the conscience in municipal employment claims in the Fourth Circuit. *Slaughter* 682 F.3d at 322. However, as Judge Wynn stressed in his concurrence (*id.* at 324), voluntariness is **not** part of the test articulated by the Supreme Court in *Collins* and *Lewis*. Rather, *Collins* requires affirmative acts for a substantive due process violation (503 U.S. at 125–26), and *Lewis* holds that deliberate indifference applies "only when actual deliberation is practical" (523 U.S. at 851). These "decisions underscore the Supreme Court's view that, at least in some cases, reckless and deliberately indifferent government action may be arbitrary and egregious in a constitutional sense and thus provide grounds for a viable § 1983 Due Process Claim." *Slaughter*, 682 F.3d at 324–25 (Wynn, J., concurring).

Accordingly, *Slaughter* is flawed because it attributes a holding to the Supreme Court that it never made, claiming that "the *Collins* Court made clear that [deliberate indifference] does not apply to persons in an employment relationship with the government." *Slaughter*, 682 F.3d at 321. However, *Collins* expressly disclaimed this proposition: "**The employment relationship, however, is not of controlling significance**." *Collins*, 503 U.S. at 119 (emphasis added). Rather, the claim in *Collins* failed because the complaint did "not charge the city with a willful violation of Collins' rights". *Id.* at 125. Had the plaintiff in *Collins* alleged "the supervisor knew or should have known that there was a significant risk that he would be injured" (*id.*), the outcome would have likely been different. *See Lewis*, 523 U.S. at 853 (when "extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking").

The flawed reasoning in *Slaughter* is why the Fourth Circuit stands in isolation from every other federal circuit by requiring an intent to harm even in cases where there is ample time to deliberate.[6] Indeed, every other circuit follows the Supreme Court's mandate to engage in an "exact

---

[6] The Fourth Circuit is the only federal circuit to exclusively impose the heightened "intent to harm" pleading requirement on § 1983 state-created danger claims, even where the government has ample time to deliberate. *See, e.g. Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005) ("In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'"); *Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005) ("[T]he allegations in the complaints before us, even if they do not accuse the defendants of acting with specific intent or desire to cause physical injury, are sufficient to assert that the defendants created a serious danger by acting with deliberate indifference to it. Whether termed 'deliberate indifference' or 'recklessness,' this mental state is sufficient to establish liability in such cases 'because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk.'") (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 n. 11 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993); *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005) (to determine whether conduct is conscience-shocking, courts "must determine whether the officer is confronted with a hyperpressurized environment such as a high-speed chase, or, in the alternative, has the luxury of proceeding in a deliberate fashion; in the latter case, deliberate indifference may be sufficient to shock the conscience, while in the former, it is usually necessary to show that the officer deliberately harmed the victim."); *Morin v. Moore*, 309 F.3d 316, 321–22 (5th Cir. 2002) ("In order to recover under the state-created danger theory, we assume that a plaintiff would have to show, at a minimum, that: (1) the state actors created or increased the danger to the plaintiff and (2) the state actors acted with deliberate indifference."); *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) ("The guiding principle seems to be that a deliberate-indifference standard is appropriate in "settings [that] provide the opportunity for reflection and unhurried judgments," but that a higher bar may be necessary when opportunities for reasoned deliberation are not present."); *Lisby v. Henderson*, 74 F.4th 470, 472 – 73 (7th Cir. 2023) ("These cases hold that a plaintiff seeking relief under § 1983 for such a claim must plead sufficient facts to establish that the officer acted with "criminal recklessness—which is the same as deliberate indifference."); *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) "[p]roof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold."); *Polanco*, 76 F.4th at 926 (government "liable when they affirmatively, and with deliberate indifference, create or expose

analysis of circumstances" rather than a "mechanical application" of predetermined rules. *Lewis*, 523 U.S. at 850.

Thus, the correct measuring stick for conscience-shocking conduct is whether "actual deliberation is practical." *Lewis*, 523 U.S. at 851; *see also Guertin v. Michigan*, 912 F.3d 907, 924 (6th Cir. 2019) ("After *Lewis*, the key variable is whether actual deliberation is practical, not whether the claimant was in state custody."). When deliberation is practical, indifference can shock the conscience. When there is no time to deliberate, intent to harm is required. *See Lewis*, 523 U.S. at 853–54 (explaining that "intent to harm" is reserved for "unforeseen circumstances demand[ing] an officer's instant judgment," and does not apply to "unhurried judgments [with] the chance for repeated reflection"). Even the Fourth Circuit has acknowledged that deliberate indifference can shock the conscience in a municipal employment claim, "but only in special circumstances." *Waybright*, 528 F.3d at 205.

Moreover, if voluntariness were an outright bar, the Fourth Circuit would have affirmed the dismissal in *Washington*. A tenant, like a municipal employee, is in a voluntary relationship with the government. The tenant in *Washington* was not required to live at a Housing Authority property but chose to do so. Yet, the Fourth Circuit only considered whether the Housing Authority had "ample time to deliberate and reflect on [its] choices." *Washington*, 58 F.4th at 179. This is the correct approach under *Lewis*. Accordingly, voluntariness does not preclude a finding of conscience-shocking deliberate indifference. Rather, whether the government had time to deliberate or made a split-second decision is determinative.

---

their employees to a dangerous work environment"); *Matthews v. Bergdorf*, 889 F.3d 1136, 1150 (10th Cir. 2018) (conduct is conscience-shocking when "the state actor acted recklessly in conscious disregard of the [state-created] risk"); *Nix v. Franklin Co. School Dist.*, 311 F.3d 1373, 1376 (11th Cir. 2002) ("Acts that fall between the poles of negligence and malign intent require courts to make "closer calls," in which the determination of what shocks the conscience is context-specific. "Deliberate indifference that shocks in one environment may not be so patently egregious in another.") (cleaned up).

**B. Plaintiffs Sufficiently Allege a State-Created Danger Substantive Due Process Violation**

A municipality is constitutionally liable when it "created or increased the risk of private danger ... through affirmative acts, not merely omissions." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015); *see also Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995) ("state actors may not disclaim liability when they themselves throw others to the lions"). Here, the Complaint charges the City with repeated affirmative acts over more than ten years, which created and/or increased the specific danger that ultimately caused the actionable harm. Accepting the allegations as true and giving Plaintiffs the benefit of all reasonable inferences, the City, with "the chance for repeated reflection," consciously disregarded a serious risk of harm "when actual deliberation [was] practical." *Lewis*, 523 U.S. at 851.

**1. The City's Affirmative, Deceptive Conduct Created or Increased the Risk**

The City affirmatively created and concealed a deadly hazard. It disbanded the Code X-Ray program after prior firefighter injuries and collapses, concealed critical safety data in the CAD system, and instructed officials not to inform rank-and-file firefighters of its cessation. Simultaneously, the City continued to represent through its actions and statements that the program remained in force. Firefighters, including the Plaintiffs, reasonably believed the City's representations, knowing that absent a safety protocol like Code X-Ray, the foreseeable consequence was firefighter casualties. Finally, the City increased the risk of harm by ordering Plaintiffs into a building it knew was condemned, structurally unsound, had previously collapsed, and would have been marked and cataloged as a Code X-Ray property, had Code X-Ray not been terminated years earlier. These allegations sufficiently allege that the City took the requisite affirmative actions to trigger liability under the state-created danger theory.

**2. The City's Conduct Shocks the Conscience**

The standard for a substantive due process claim is conduct that "shocks the conscience." *See Lewis*, 523 U.S. at 851. Although the Fourth Circuit has limited the conscience-shocking standard in

the municipal employment context only to conduct "intended to harm," *Slaughter*, 682 F.3d at 323, it nevertheless recognized the "special circumstances" under *Lewis* where deliberate indifference can shock the conscience. *Waybright*, 528 F.3d at 205–06; *see also Lewis*, 523 U.S. at 852 ("deliberate indifference can rise to a constitutionally shocking level"). This case exemplifies the special circumstances where deliberate indifference can shock the conscience.

Plaintiffs allege that the City created and implemented a safety program—Code X-Ray—to protect firefighters from entering structurally unsound buildings (*i.e.* a known serious risk). Yet the City secretly discontinued the program. Worse, it did not inform its employees, did not rescind the program publicly, and did not instruct dispatchers or field supervisors to stop referring to it. Instead, dispatch communications continued to reference Code X-Ray as if it remained in effect, reinforcing the illusion that buildings lacking markings had been screened and deemed structurally sound. Firefighters who joined well after Code X-Ray's quiet discontinuation were still informed that the program remained operational.

The collapse at 205 South Stricker Street was not an anomaly. This building had previously collapsed on firefighters, making it precisely the type of structure Code X-Ray was designed to flag. The City knew this but chose not to mark the building, in part for its own economic gain (Compl. ¶¶ 47, 68, 73). Plaintiffs were dispatched to the scene under the false assurance that Code X-Ray was still operational, and they entered the building unaware of the deadly risk. That is more than mere negligence or a failure to act—it is a textbook example of deliberate indifference to a known danger, concealed through an institutional custom of misinformation. By perpetuating the illusion that Code X-Ray was an ongoing program, the City deprived firefighters of essential information they needed to make decisions concerning both their own safety, and indeed, their continued employment. And, of course, failiure to inform the firefighters that Code X-Ray was no longer in effect, led in a straight trajectory to three deaths.

**C. Plaintiffs Do Not Concede that Rule 9(b) Applies—But Even if it Does, the Allegations Satisfy its Particularity Requirement**

Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This standard is satisfied when the complaint alleges "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). However, as this Court recently recognized, Rule 9(b) "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *Lead-Off Management, Inc. v. Congo Brands Holding Co., Inc.*, Slip Copy, 2025 WL 958779, at *3 (D. Md. March 31, 2025) (cleaned up).

Rather, the purpose of Rule 9(b) is to provide a defendant with "sufficient information to formulate a defense by putting it on notice of the conduct complained of" and to ensure that "fraud actions are not used as a pretext for discovery." *Harrison*, 176 F.3d at 784–85; *see also Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1075 (D. Md. 1991) ("The most basic consideration in making a judgment as to the sufficiency of a pleading [when balancing Rules 8(a) and 9(b)] is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading.") (cleaned up).

Accordingly, where a complaint identifies the nature of the fraudulent conduct, the time in which it occurred, and the role of the corporate defendant in orchestrating or perpetuating the fraud, it satisfies the purposes of Rule 9(b), even if it does not specify the exact identity of each employee involved or the precise date of every misrepresentation. *See Harrison*, 176 F.3d at 790–92 (finding allegations against a corporation sufficient under Rule 9(b) where the complaint alleged the fraudulent scheme, general time frame, and substance of misrepresentations, even without naming individual actors).

### 1. Plaintiffs Sufficiently Allege Fraudulent Statements Attributed to the City

The Complaint alleges that the City represented that Code X-Ray was active (¶ 9), that unsafe buildings would be marked or reflected in CAD (¶ 18), and that firefighter safety was being protected (¶ 21). These statements were false, and the City knew they were false. *See* Compl. (ECF 13-2) ¶¶ 9, 37; Compl. Ex. 2 (ECF 13-4) at p. 25; Ex. 1 (Dec. of Lt. Joseph DiRusso) ¶ 1(B)-(C); Compl. Ex. 2 (ECF 13-4) at p. 25. The Plaintiffs reasonably relied on and were harmed by the City's misrepresentations. *See* Compl. Ex. 1 (ECF 13-3) ¶ 9; Ex. 1 ¶¶ 1(D), 4(B); Ex. 3 ¶ 1.

When a fraud claim is asserted against a corporate entity like the City,[7] the plaintiff is not required to identify the specific employee who made each misrepresentation. *See, e.g., McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013) (reversing dismissal for lack of particularity, finding "the identity of the person making the misrepresentation was Ocean Bank"). Courts in the Fourth Circuit have held that it is sufficient under Rule 9(b) to allege that the corporation made false representations because "a corporate employer can only act ... through its agents." *New River Electrical Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.4th 213, 220 (4th Cir. 2022); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (particularity requirement is satisfied when plaintiff alleges fraud against corporation without naming individual employees); *Harrison*, 176 F.3d at 794 (accepting the corporation as the person making the misrepresentation); *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 297 (D.S.C. 1999) ("a corporation can act only through its officers and agents") (citation omitted).

Here, the allegations, supported by Declarations and the Board of Inquiry report, meet the standard established in *Harrison* and satisfy the particularity required under Rule 9(b).

---

[7] The City concedes (at 18) that it "is a municipal corporation."

### D. Plaintiffs Plausibly Allege a *Monell* Claim

Under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), when a municipal policy or custom causes the constitutional injury, it "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief." Therefore, to survive a motion to dismiss, a plaintiff must allege "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of [the plaintiff's] rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). In other words, the policy must be the "moving force behind a deprivation of federal rights." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

The City's argument (at 21) that a *Monell* claim cannot stand without an individual City employee named as a defendant is simply wrong. It improperly conflates the standard in a passive failure to train claim with a deliberate indifference claim, where the municipality is charged with affirmatively causing the harm. Failure to train *Monell* claims require an employee to be named as a defendant because, in those cases, the municipality is simply a passive participant in the harm. *See Anderson v. Caldwell County Sheriff's Office*, 524 Fed. App'x 854, 862 (4th Cir. 2013) ("Because no Fourth Amendment violation occurred, the sheriff and the CCSO may not be held liable for failure to train or supervise the Caldwell County deputies.").[8]

Here, the Plaintiffs seek to hold the City liable under *Monell* as an active participant, not a passive observer. Therefore, the threshold questions are whether (1) the "harm was caused by a constitutional violation, and if so, (2) whether the [C]ity is responsible for that violation." *Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting *Collins*, 503 U.S. at 120).

The Plaintiffs allege a multi-year institutional course of conduct in which the City:

---

[8] The City also cites *Waybright* and *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999). However, *Waybright* did not involve a *Monell* claim, but rather a § 1983 claim for the "supervisor[s'] role in creating the conditions that allegedly led to Waybright's death." *Waybright*, 528 F.3d at 203. And *Grayson* was abrogated in 2023 by *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

- Quietly discontinued a critical safety program that Plaintiffs relied on without notice;
- Knowingly allowed supervisors and dispatchers to continue acting like the program still existed;
- Chose not to rescind the Code X-Ray Departmental Order, which further misled Plaintiffs;
- Failed to correct internal communications and operating procedures; and
- Knowingly dispatched unsuspecting Plaintiffs into a previously collapsed structure, knowing the high likelihood of collapse and death.

Plaintiffs further allege that but for these unconstitutional City policies, 205 Stricker Street would have been marked as a Code X-Ray property, and Plaintiffs would not have been harmed. *See* Compl. (ECF 13-2) ¶¶ 34–36. The Board of Inquiry similarly concluded: "The absence of critical building information to responding units and the lack of a visual que [sic] on the building was detrimental to the outcome of this fire." *See* Compl. Ex. 2 (ECF 13-4) at p. 117; *see also Washington*, 58 F.4th at 175.

The City maintained dispatch protocols that referred to a defunct program; it failed to flag condemned properties despite a known history of fatalities at those sites; and it made no attempt to inform those most at risk of the program's termination. The City's failure to update internal systems and its perpetuation of misleading safety assurances to employees is precisely the type of policy-driven constitutional injury *Monell* addresses. Indeed, a *de facto* policy of ignoring Code X-Ray's termination while continuing to affirm its existence is actionable under *Monell*. *See Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) (holding that a "custom by condonation" is actionable under *Monell*). These failures reflect deliberate policy choices or, at minimum, a custom of reckless disregard for firefighter safety—*i.e.* a sufficient claim under *Monell*.

Ultimately, the constitutional violation here was not caused by a rogue employee or clerical error. It was the result of systemic policy-level misconduct, fully attributable to the City under *Monell*. Stated somewhat differently, Plaintiffs have alleged "brief, but non-conclusory, allegations containing facts which, if true, would buttress [their] legal conclusion." *Washington*, 58 F.4th at 183. Accepting the well-pleaded facts as true, Plaintiffs sufficiently allege that the violation of their substantive due

process rights "would have been avoided under a program that was not deficient in the identified respects." *Washington*, 58 F.4th at 184. The Court should deny the Motion accordingly.

## E. State Law Claims Are Not Preempted by the Maryland Workers' Compensation Act

### 1. Constitutional Claims Are an Exception to the Workers' Compensation Acts' "Exclusivity Rule"

The exception to the "exclusivity rule" is if the worker was, as the Decedents and surviving fire fighter were here, an employee of a local or state government and was injured or killed as a result of, at a minimum, "deliberate indifference" of their employer, the injured worker, or the family of the decedent, may bring a civil rights action for the violation of the workers' constitutional rights pursuant to 42 U.S.C.A. § 1983. Preemption dictates that such suits are not barred by exclusivity provisions of a Workers' Compensation Act.

As stated in detail above, in order to state a cause of action under § 1983, a plaintiff must allege:

1) That they were deprived of a right secured by the Constitution or the laws of the United States; and
2) That the deprivation was caused by a person acting under color of state law. United Food & Commercial Workers Local 1099 v. City of Sidney, 364 F.3d 738, 746 (6th Cir. 2004).

§ 1983 protects citizens from the infringement by government authorities of their rights, privileges, and immunities as secured by the United States Constitution and federal law. Second, it provides a **federal remedy** against the violating party as a means of vindicating these protected rights. (Monroe v. Pape, 365 U.S. 167 (1961) (overruled on other grounds by *Monell*, 436 U.S. 658); *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).

Congress intended § 1983 to provide a remedy in federal courts *supplementary* to any remedy existing under state law. *Damico v. California*, 389 U.S. 416, 417 (1967). The federal courts have explicitly held that a Workers' Compensation Act cannot preclude a remedy under § 1983 for violation of a right secured by the United States Constitution (*See Rosa v. Cantrell*, 705 F.2d 1208, 1220–21 (10th Cir. 1982) ("The exclusive remedy of state Workers' Compensation statutes does not bar

recovery against an employer under § 1983."); *Walker v. Rowe*, 535 F. Supp. 55, 57 (N.D. Ill. 1982) (state workers' compensation law "does not and could not preclude the vindication of plaintiff's constitutional rights in a federal forum"); *Hutchings v. Erie City and County Library Bd. of Directors*, 516 F. Supp. 1265, 1272–73, (W.D. Pa.1981) (Workers' Compensation Act did not bar employees from asserting claims against an employer under § 1983.). Federal law takes priority over any state law provisions that directly or effectively contradict or interfere with it. *Hayfield Northern R. Co., Inc. v. Chicago and North Western Transp. Co.*, 467 U.S. 622, 627 (1984). *See also Rosa*, 705 F.2d at 1220–21 (holding § 1983 preempts state workers' compensation law); *Walker*, 535 F. Supp. at 57 (same).

To allow the government employer to escape liability by relying on state law defenses interferes with the basic social policy which favors the enforcement of federal civil rights. It also interferes with the crucial policy of preventing abuses of power by those acting under color of state law. *Robertson v. Wegmann*, 436 U.S. 584, 591, 98 S. Ct. 1991, 1995, 56 L. Ed. 2d 554 (1978); *Rosa v. Cantrell*, 705 F.2d 1208, 1221 (10th Cir. 1982).

In Pennsylvania, the United States District Court held that the Workers' Compensation Act (WCA), 77 Pa. Cons. Stat. Ann. § 481, could not preclude a remedy for violation of a right secured by the United States Constitution. It involved specifically a 42 U.S.C.S. § 1983 claim. *Vearling v. Bensalem Twp. Sch. Dist.*, Civil No. 94-7711, 1997 U.S. Dist. LEXIS 3103, at *1 (E.D. Pa. Mar. 17, 1997).

Allowing a state to extinguish a § 1983 cause of action through an "exclusivity" provision in its own remedial scheme, no matter how adequate it may be, would frustrate Congress's intent to create a federal remedy independent of, and supplementary to, any available state remedy. As the U.S. District Court in another neighboring state held, upholding Congress's intent to create a broad federal remedy for the protection of constitutional rights requires that § 1983 preempt the exclusivity provision

in the Virginia Worker's Compensation Act. *Stephens v. Cty. of Albemarle*, No. 3:04CV00081, 2005 U.S. Dist. LEXIS 56852, at *1 (W.D. Va. Aug. 26, 2005).

The Fourth Circuit has stated that Federal law preempts state and common law when Congress expressly provides that the federal law supplants state authority in a particular field, or when its intent to do so may be inferred from a pervasive system of regulation which does not leave a sufficient vacancy within which any state can act." *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir. 1993). This court recently wrote: "Preemption may also be inferred where state legislation would impede the purposes and objectives of legislation enacted by Congress." *Id. Triax, Inc. v. Tforce Freight, Inc.,* No. 1:22-cv-01693-JRR, 2023 U.S. Dist. LEXIS 23446, at *4 (D. Md. Feb. 11, 2023)

As stated in the leading treatise on Maryland Workers' Compensation law:

The workers' compensation practitioner, however, should simply be aware of the possible availability of this exception (§1983 claims) to the exclusivity clause in the narrow circumstances of a workplace injury where a government employer violates an employee's rights under the United States Constitution or the Maryland Declaration of Rights.

(Sobin, C. B. (2024). *Introduction for the 2024–2025 edition, MD workers' compensation highlights*. In *Maryland Workers' Compensation: September 2024 update* (pp. 1202–1206).

The Fourth Circuit has held, with respect to ERISA actions. *See Prince v. Sears Holdings Corp.*, 848 F.3d 173, 175 (4th Cir. 2017).

2. **Assuming, Solely *Arguendo*, that § 1983 Claims Do Not Preempt Maryland's Workers' Compensation Act's "Exclusivity Rule," § 9-509 Does Not Apply to Either the § 1983 Claims or the State Claims of Plaintiffs Yolanda Butrim, Lacey Marino, Jerry Norman, and Gloria Lacayo Since § 9-509 Only Bars Suits by "Covered Employees" or "Dependents," and None of These Four Plaintiffs Are Either**

   a. *Only "Dependents" Are Barred by Maryland's Workers' Compensation Act*

   § 9-509 of the Maryland Workers' Compensation Act explicitly identifies who is barred from suing employers responsible for workplace fatalities:

   1. Except as otherwise provided in this title, the liability of an employer under this title is exclusive.

**2.** Except as otherwise provided in this title, the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person. Md. Lab. & Empl. Art. § 9-509(a-b) (emphasis supplied).

Maryland's General Assembly chose to define the scope of the immunity conferred. It did not bar non-dependents, such as Plaintiffs Yolanda Butrim, Lacey Marion, Jerry Norman, and Gloria Lacayo from exercising their legislatively granted right under separate statutes (§ 1983 or Maryland's Wrongful Death Act, or State Tort Claim Act) or common law to hold liable the entity responsible, Baltimore City, for their loved ones' deaths.

What the drafters of the text of the exclusive remedy provision itself did not include is as important as the wording they did. Maryland's Supreme Court has steadfastly said: "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *In re Collins*, 468 Md. at 689 (2020). The federal courts have reaffirmed this, stating: "In Maryland, the cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature." *Askew v. HRFC, LLC*, 810 F.3d 263, 265 (4th Cir. 2016). This inquiry "begin[s] with the plain language of the statute, and ordinary, popular understanding of the English language." *Id.* at 268. Thus, the search for evidence of legislative will "begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Williams v. Morgan State Univ.*, 484 Md. 534, 546 (2023).

The judiciary can "neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning". *Petry v. Prosperity Mortg. Co.*, 758 F.3d 543, 545 (4th Cir. 2014). The text of the exclusive remedy provision sets out only two classes of potential plaintiffs for whom workers' compensation is their exclusive remedy: a "covered employee" and his/her "dependents." To exclude the 4 Plaintiffs who were not "dependents", runs afoul of the "principle of *ejusdem generis*, 'if the [General Assembly] had intended the general words to be

construed in an unrestricted sense, it would not have enumerated the specific things.'" *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 189 (2022). Because § 9-509 enumerates "specific things" – "covered employees" and "dependents" - it is improper to suppose Maryland's General Assembly also intended the Section's preclusive effect to "general things" – blanket immunity for all wrongful death suits arising out of workplace fatalities.

From the words the Maryland General Assembly chose, and the ones they did not choose to add (non-dependents), there is but one logical and judicially allowable conclusion, - the exclusivity conferred in subsection (a) is premised on an employer's having purchased workers' compensation insurance that results in payment of "compensation provided under this title to a covered employee *or the dependents* of a covered employee..." If no death benefits are paid, because a potential plaintiff is not eligible for workers' compensation death benefits, such as the 4 above-named Plaintiffs, there is no exclusivity.

The Maryland Supreme Court in *Bd. Of Educ. v. Marks-Sloan*, 428 Md. 1, 14 (2012) wrote: the "purpose of the exclusivity rule is to ensure swift compensation to the injured employee and to prevent a double recovery, through a workers' compensation award and a tort judgment, from an employer by an injured employee." *Id.* No such double recovery occurs here if the above-mentioned 4 Plaintiffs' claims proceed.

It is helpful to understand how each of the statutes, § 1983, Wrongful Death, Maryland Tort Claim Act, and Workers' Compensation Act involved would govern if the three deceased fire fighters (Butrim, Sadler and Lacayo) had been killed somewhere other than work, or if the 4 above-named Plaintiffs had been a dependent of one of the deceased firefighters.

*Hypothetical I – Wrongful Death Not Work Related*

Had the firefighters' death been caused by the actions or negligence of anyone other than their employer, the 4 non-dependent Plaintiffs would have had the right to prosecute a wrongful death action

against any individual or company responsible. They would have the burden of proving that Defendant's negligence caused their loved ones' death. Defendant Baltimore City could argue that any (or all) of the Decedents were guilty of contributory negligence or any other available fact-based defense. A jury would ultimately decide whether the defendant should be held accountable for the death.

*Hypothetical II – Wrongful Death Work Related, And Plaintiffs Were Financially Dependent*

Had those four Plaintiffs, on the other hand, been a dependent of any of the deceased firefighters, they would have been entitled to workers' compensation death benefits, without the cost or delay of litigation. Their right to death benefits would not be contingent on the outcome of a jury trial. Rather, they would have been paid compensation owing to the loss of a deceased breadwinner who financially provided for them. Workers' compensation benefits are intended to compensate claimants in death cases due to the loss of the decedent worker's paychecks, upon which *the dependents* had relied upon to live. There is no compensation for pain and suffering.

*Hypothetical III - The Present Situation*

Yolanda Butrim, Lacey Marion, Jerry Norman, and Gloria Lacayo, however, are *non-dependent* adult relatives of the 3 deceased firefighters, who have sued the deceased firefighters' employer for wrongful death, a legislatively created right outlined in Md. Cts. & Jud. Proc. Art. § 3-904(e) as well as violations of the U.S. Constitution under 42 U.S.C. § 1983. Nowhere in the text of Md. Lab. & Empl. Art. § 9-509 did the Maryland General Assembly extend the preclusive reach of that provision to bar the right of non-dependent relatives to sue for the wrongful death of an adult, either in the 1999 legislative session creating such a right for adult relatives, in the Maryland Tort Claim Act, or in any legislative session.

There is no reason to suppose that the drafters of § 9-509's exclusive remedy provision intended to bar wrongful death claims by non-dependent adult relatives. At the time of the adoption of the

Workers' Compensation Act in 1914, parents of adult children did not have the right to sue for wrongful death, so these non-existent plaintiffs could not have bargained that right away. When the Maryland General Assembly gave adult children the right to sue for the wrongful death of a loved one in 1999, it "is presumed to know the law" or laws it was amending. State v. Enriquez, 327 Md. 365, 373 (1997). It created a right for adult children to sue for the wrongful death of a an immediate adult family member by amending a Wrongful Death statute that until that time allowed only spouses and minor children that right.

   3.  **Exclusivity Would Unconstitutionally Deny Plaintiffs Yolanda Butrim, Lacey Marino, Jerry Norman, and Gloria Lacayo the "Right to a Remedy" Guaranteed by the Maryland and United States Constitutions**

The Maryland Declaration of Rights Article 19 states:

> That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land.

Allowing Md. Lab. & Empl. Art. § 9-509's exclusive remedy immunity to bar wrongful death claims of non-dependent adults who are unable to file a workers' compensation claim contravenes Article 19 of the Maryland Declaration of Rights and the United States Constitution.

The Maryland General Assembly has never substituted a "streamlined" administrative death benefit under workers' compensation for non-dependents as they have for dependents of adults killed. It would be a misreading of the Legislature's actions to conclude that § 9-509 includes an intent, wholly missing from its text, to leave adult non-dependents with no remedy at all for a loved one's death.

In *Piselli v. 75th St. Med., P.A.*, 371 Md. 188, 204-205 (2022), Maryland's highest Court set out the history of this constitutional 'Remedy Clause':

> 'Article 19 of the Maryland Declaration of Rights . . . guarantees a 'remedy by the course of the Law of the land, . . . according to the Law of the land,' for 'every [person], for any injury done to him [or her] in his [or her] person or property.'' Article 19 was part of the original Maryland Declaration of Rights adopted in 1776, although it was

then designated as Article 17 of the Declaration of Rights... These provisions, often referred to as 'Remedy Clauses' or 'Open Courts Clauses' or 'Access to Courts Clauses,' are based on Chapter 40 of the Magna Carta or, more particularly, Lord Coke's interpretation of Chapter 40.'

"'[a]n examination of our opinions concerning Article 19 discloses that the constitutional provision generally protects two interrelated rights: (1) a right to a remedy for an injury to one's person or property; (2) a right of access to the courts...' Article 19 ensures that rights belonging to Marylanders are 'not illegally or arbitrarily denied by the government . . .'"
*Id.* at 205 (quoting *State v. Board of Education*, 346 Md. 633, 647 (1997)).

The belief that § 9-509 can be construed to bar the 4 named non-dependent Plaintiffs' statutory right to sue for the wrongful death of their family members, without simultaneously substituting an administrative remedy, offends these twin "interrelated rights." We are not dealing with a conditional right or a capped right, but the complete abrogation of the 4 Plaintiffs' right to hold their immediate family member's employer accountable for its culpable role in causing their loved ones' deaths.[9]

In the seminal case of *Jackson v. Dackman Co.*, 422 Md. 357, 378-379 (2011), Maryland's highest court, quoting *Piselli*, *supra*, reconfirmed that "the constitutional provision [Article 19] generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts." *Id.* at 378. Unanimously, the Court held that capping damages available to recompense brain damaged children to $17,000.00 was a constitutionally unreasonable restriction under Article 19 of the Maryland Declaration of Rights. *Id.* at 382-3.

Here, there is no justification for extending exclusivity to those who do not have a remedy pursuant to the Workers' Compensation Act (e.g. "covered employee" and "dependents" enumerated in the text of § 9509(b)). Extending immunity to wrongful death claims by adult non-dependents denies

_____

[9] If this case proceeds defendant will have the right to argue it was not negligent, or that the Decedents were contributorily negligent or assumed the risk. Since Defendant's motion to dismiss is based on § 9-509 immunity, Plaintiffs' well pleaded allegations that the employer was negligent, and that the Decedents and the lone surviving

these grieving loved ones any redress. The 4 non-dependent Plaintiffs have no right to workers' compensation death benefits.

### 4. While Certain Restrictions May Pass Muster, Complete Denial of Any Remedy Violates Article 19 of the Maryland Constitution and the United States Constitution

The issue in the instant case is not a *restricted* remedy, but the reading of an immunity provision beyond its plain language to deny non-dependent adult wrongful death plaintiffs **any** remedy for the loss of a parent who perished as a result of an employer's negligence. In *Jackson*, the Maryland Court had little trouble finding that a cap that immunized landlords for damages claimed by brain-damaged children to $17,000.00 was unreasonable. Extrapolating that holding to this case, had the General Assembly capped damages for workplace wrongful death suits to $17,000.00, it is highly likely the amount would be found to be an unreasonable sum for the wrongful death of a loved one. Reducing that amount to zeros for the loss of a loved one is, on its face, is even more unreasonable than capping damages at $17,000.00 - thereby running afoul of Article 19.

In *Jacome de Espina v. Jackson*, 442 Md. 311 (2015), the Supreme Court of Maryland synthesized Jackson and Piselli, supra, and concluded that "[r]estrictions resulting in **no compensation** or "drastically inadequate" compensation (*i.e.*, "almost no compensation") were held to be unreasonable in *Piselli* and *Dackman*." *Id.* at 338 (emphasis added).

Interpreting § 9-509 beyond its plain meaning to leave the 4 non-dependent Plaintiffs with no remedy runs afoul of the constitutional right to a remedy guaranteed by Article 19 of the Maryland Constitution and the Due Process Clause of the 5th and 14th Amendments of the United States Constitution.[10]

For all the foregoing reasons, the Court should deny the City's Motion.

---

[10] Unreasonable restrictions not only run afoul of Article 19 but are subject to heightened scrutiny under the constitutional right to equal protection conferred by Article 24 of the Maryland Declaration of Rights. *Murphy*, 325 Md. at 267.

Respectfully submitted,

**FURMAN | HONICK LAW**

_____

_____/s/ Kenneth Berman_____

**Kenneth Berman, #08529**
BERMAN, SOBIN, GROSS, LLP
481 N. Frederick Avenue, Suite 300
Gaithersburg, MD 20877
Telephone: (301) 670-7030
Facsimile: (301) 670-9492
kberman@bsglaw.com
***Counsel for Plaintiffs***

**Allen E. Honick, Esquire, #19822**
**Dustin C. Furman, #19986**
11155 Red Run Boulevard, Suite 110
Owings Mills, Maryland 21117
(410) 844-6000 – Office
(410) 705-5651 – Facsimile
allen@fhjustice.com
***Counsel for Plaintiffs***

_____/s/ Kevin Stern_____

**Kevin Stern, #29869**
**Daniel Miller, #29862**
MILLER STERN LAWYERS, LLC
2800 Quarry Lake Drive, Suite 280
Baltimore, MD 21209
Telephone: (410) 529-3476
Facsimile: (410) 529-2450
dan@millersternlawyers.com
kevin@millersternlawyers.com
***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 12, 2025, a copy of the foregoing Opposition was served on all counsel of record via the Court's ECF system.

_____

**Allen E. Honick, Esquire, #19822**