**IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>**

<table>
<tr><td>

**RACHEL BUTRIM,** *et al.*,

**Plaintiffs**

**v.**

**MAYOR AND CITY COUNCIL
OF BALTIMORE,**

**Defendant.**
</td><td>

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

\* \* \* \* \* \* \* \* \* \* \*
</td><td>

**Civ. No. MJM-25-796**
</td></tr>
</table>

<u>**MEMORANDUM OPINION**</u>

Plaintiffs brought this civil action against the Mayor and City Council of Baltimore (the "City" or "Defendant") alleging state-created danger in violation of the Due Process Clause, as well as claims for negligence, survival, and wrongful death under Maryland law. This matter is before the Court on the Defendant's Motion to Dismiss. ECF No. 11. The motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, the Court shall grant Defendant's Motion to Dismiss and dismiss this case without prejudice.

## I.    BACKGROUND

### A.  Factual Background[1]

In the minutes before 6:00 a.m. on January 24, 2022, firefighters from the Third Battalion of the Baltimore City Fire Department ("BFD") responded to a fire at 205 South Stricker Street

---

[1] The following facts are drawn from allegations in the Complaint (ECF No. 7).

(the "Property"), a condemned rowhome in the Mount Clare neighborhood of Baltimore, Maryland. ECF No. 7 (Compl.) ¶¶ 11, 75. Six firefighters were ordered to enter the structure, and the house collapsed moments later. *Id.* ¶ 12. There were no markings or placards placed outside the Property indicating that it was structurally compromised. *Id.* ¶ 11. After the collapse, a rescue team removed two firefighters from the home; three of the others—Paul Butrim, Kelsey Sadler, and Kenneth Lacayo—died; and the sixth firefighter—John McMaster—sustained serious permanent injuries. *Id.* ¶ 12. (Paul Butrim, Kelsey Sadler, Kenneth Lacayo, and John McMaster are referred to herein as "Plaintiff Firefighters.")

Unbeknownst to Plaintiff Firefighters, the Property was structurally unsound at the time of the fire. *Id.* ¶ 15. It had been vacant for fourteen years. *Id.* A fire at the Property in October 2015 caused a partial collapse of its interior, trapping and injuring three firefighters. *Id.* ¶ 34. In response to this fire, the City condemned the Property because the fire's damage left it "unsafe and uninhabitable." *Id.* Further, in March 2016, another fire left the Property exposed to the elements by destroying its roof. *Id.* ¶ 35. Neighbors had repeatedly complained to the City about the safety and structural integrity of the Property, but the City took no action to mitigate the risk. *Id.*

Due to the probability of injury or death in vacant and/or structurally compromised buildings like the Property, federal agencies have enacted various safety requirements detailed in the Complaint, such as the instruction that fire departments "implement a marking system to warn unsuspecting firefighters not to enter [structurally compromised] properties," and that information about compromised properties be stored in a database and relayed to responding units during dispatch. *Id.* ¶ 56. According to the U.S. Fire Administration ("USFA"), marking structurally compromised condemned properties is the most effective tool to prevent firefighter deaths. *Id.* Further, the National Institute for Occupational Safety and Health ("NIOSH") has concluded that

"almost every firefighter death caused by an unsafe vacant property collapse could have been avoided with an adequate marking system." *Id.*

In 2010, "to comply with federal regulators and industry standards," as well as "in response to the 'serious known threats associated with unsafe vacant buildings,'" the City implemented a program called Code X-Ray to ensure that firefighters would never be ordered into a structurally unsafe condemned property. *Id.* ¶ 17 (no citation). Under Code X-Ray, the City marked structurally compromised buildings with reflective placards or a painted red X, which warned firefighters not to enter. *Id.* The City promised its firefighters, including Plaintiff Firefighters, that it would maintain a database of all unsafe condemned structures under Code X-Ray, syncing that database to the computer-aided fire dispatch system ("CAD"). *Id.* ¶ 18. The CAD system was supposed to warn responding units and provide specific property details to guide risk assessment and firefighting techniques. *Id.* It was meant to act as a failsafe if a structurally compromised building was not physically marked by Code X-Ray. *Id.* A marking system like Code X-Ray was necessary for the City to secure and maintain grants for municipal services, as new federal funding was "increasingly conditioned on adequate safety and mitigation strategies for vacant and condemned properties." *Id.* ¶ 19. In addition to Code X-Ray, the BFD Manual of Procedure ("MOP") 606-10 was another safety measure, stating, in relevant part:

> The safety office has established a list of unsafe buildings. The list will be used to inform responding units of unsafe conditions existing at the location to which they are responding.
>
> The safety office will enter the information into a database and will forward unsafe property locations to fire communications to be placed in CAD.

*Id.* at 4.

But the City discontinued the Code X-Ray program, failed to enforce MOP 606-10, and "intentional[ly] cover[ed up] . . . the cessation of [the] Code X-Ray program" by "instruct[ing]

those in charge to not send word out or put in writing such cessation." *Id.* at 4–5, ¶¶ 11, 13, 22. Plaintiffs claim that this concealment was "to prevent a mass exodus" from the BFD. *Id.* ¶ 23. Further, former BFD Chiefs and elected City Officials "intentionally and deliberately chose not to announce the discontinuation of Code X-Ray" because they did not want their names associated with the discontinuation of a potentially life-saving program. *Id.* at 4–5. The Property's fourteen-year vacancy, the 2015 and 2016 fires, and the accompanying damage were required under MOP 606-10 to be disclosed to Plaintiff Firefighters, but were intentionally concealed. *Id.* ¶ 15. By failing to input the relevant information about the Property into the CAD system as required by MOP 606-10, the City led Plaintiff Firefighters to believe that the Property was not at serious risk of collapse. *Id.* ¶¶ 11, 40. "Multiple former Chiefs and firefighters" requested reinstatement of Code X-Ray and that firefighters be informed of the Property's condemned status, but the City declined to take these actions. *Id.* at 5. There were "warning" emails sent to City officials concerning condemned vacant dwellings and the importance of data entry regarding these properties, relaying "that it would be inevitable that firefighters would be hurt and/or killed," but these warnings were intentionally ignored. *Id.* at 6.

The City falsely portrayed that Code X-Ray was active. *Id.* ¶ 14. On January 5, 2012, the City sent an email to BFD containing instructions to enforce the program, but there was no email sent out about the program's eventual discontinuation. *Id.* Plaintiff Firefighters, and other firefighters, relied on the City's repeated assurances, "and therefore understood, as a material term of their municipal employment, that they would not be ordered into structurally unsafe condemned buildings." *Id.* ¶ 22. According to the Complaint, Plaintiff Firefighters would not have continued working for the City if they knew that it had lied about Code X-Ray's discontinuation "because they valued their lives and families more than their municipal jobs." *Id*.

4

The City maintained this "policy of deception" for more than ten years before the incident at issue here, and as a result of this policy, at least one other Baltimore firefighter was killed in 2014 and three others injured in 2015. *Id.* ¶¶ 21, 24. After the 2014 death, NIOSH found numerous deficiencies in the City's firefighting protocols regarding vacant structures and "explicitly told the City to begin marking unsafe vacant properties to avoid another tragedy." *Id.* ¶ 25. Between 2014 and 2018, the Occupational Safety and Health Administration, USFA, and the National Fire Protection Association ("NFPA") updated their standards and advised municipalities, including the City, to place exterior signs on structurally compromised buildings. *Id.* ¶ 27. The City never corrected its deficiencies and instead continued lying to firefighters about the existence of Code X-Ray and, therefore, material terms of their employment. *Id.* ¶ 26. The Complaint alleges that the City was deliberately indifferent when it intentionally disregarded the risk of unmarked, structurally unsafe, condemned properties and intentionally exposed Plaintiff Firefighters to that risk. *Id.* ¶ 32.

After the 2015 and 2016 fires at the Property, inspectors reported that the Property was structurally compromised and needed to be demolished, but the City never acted on the reports and, therefore, ignored actual notice that the Property was at serious risk of collapse. *Id.* ¶ 40. The City never marked or demolished the Property and never input the relevant information into the CAD system. *Id.* The Complaint further alleges that the City failed to act because, since at least 2017, it was withholding certain vacant properties in impoverished neighborhoods from public tax sale due to an agreement with the Southwest Partnership ("the Partnership"), a nonprofit community organization. *Id.* ¶ 68. The Partnership would purchase these properties through a separate bulk tax sale or recommend developers to the City. *Id.* These properties were not marked in accordance with Code X-Ray because being marked made the properties unattractive to

potential investors. *Id.* ¶ 69. This scheme ensured revenue for the Partnership and the City, while leaving vacant properties, like the Property, to further degenerate without warning to firefighters. *Id.* ¶¶ 16, 71.

After the incident at issue here, NIOSH found that the City violated numerous USFA standards and NFPA directives. *Id.* ¶ 29. The Board of Inquiry ("BOI") Line of Duty Death Report concluded, in relevant part, "There was no program or policy in effect that addressed notification to [firefighters] of dwellings which were vacant and unsafe," and "The absence of critical building information and the lack of a visual cue on the building was detrimental to the outcome of this fire." *Id.* ¶ 37. Therefore, according to the Complaint, the BOI "confirmed that the City fabricated the existence and/or the implementation of the Code X-Ray program, purposely misleading firefighters . . . since at least 2010." *Id.* ¶ 38.

### B. Procedural Background

Plaintiffs are Rachel Butrim, individually as the surviving spouse and as personal representative of the Estate of Paul Butrim; Paisley Butrim, individually as the surviving daughter of Paul Butrim; Lacey Marino, as personal representative of the Estate of Kelsey Sadler; Brandon Sadler, individually as the surviving spouse of Kelsey Sadler; Jerry Norman, individually as the surviving father of Kelsey Sadler; Gloria Lacayo, individually as surviving mother and as personal representative of the Estate Kenneth Lacayo; and John McMaster.[2] These Plaintiffs previously brought suit against the City asserting the same constitutional claim under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). This Court granted Defendant's motion to dismiss in the prior case and dismissed the action without prejudice. *See*

---

[2] Additionally, this litigation is brought for the use of Ulonda Butrim. As a use-plaintiff, "the court may declare and protect [her] rights," but she "is not a party to the action in a legal sense." *Jefferson v. Ametek, Inc.*, 86 F.R.D. 425, 428 (D. Md. 1980) (quoting 67A C.J.S. Parties § 15 at 667).

*Butrim v. Mayor of Balt.* ("*Butrim I*"), Civ. No. MJM-24-1284, 2024 WL 5055196 (D. Md. Dec. 9, 2024).

On January 21, 2025, Plaintiffs brought a new civil action against Defendant in the Circuit Court for Baltimore City. ECF No. 1 ¶ 1. In the instant case, Plaintiffs re-assert their § 1983 *Monell* claim alleging the City subjected Plaintiff Firefighters to a state-created danger in violation of their substantive due process rights, and they add claims for negligence, survival, and wrongful death under Maryland law.

Defendant removed the instant case to this Court on March 11, 2025, ECF No. 1-2, and filed a Motion to Dismiss the Complaint a week later, arguing that Plaintiffs fail to state any plausible claim for relief, ECF No. 11. Plaintiffs responded in opposition to Defendant's Motion, ECF No. 16, and Defendant replied, ECF No. 18.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "In alleging fraud or mistake," however, Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710

F.3d 551, 559 (4th Cir. 2013) (citation omitted). "The standard set forth by Rule 9(b) aims to provide defendants with fair notice of claims against them and the factual ground upon which they are based, forestall frivolous suits, prevent fraud actions in which all the facts are learned only following discovery, and protect defendants' goodwill and reputation." *Id.* (citation omitted).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual allegations" to satisfy Rule 8(a)(2), but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (third alteration in *Iqbal*).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal

conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012).

## III.    DISCUSSION

Defendant moves to dismiss the Complaint in its entirety for Plaintiffs' failure to state any plausible claim for relief. Specifically, Defendant argues that Plaintiffs fail to state a plausible claim for an unconstitutional state-created danger because they do not allege sufficient facts to show that the City took affirmative actions with the intent to harm Plaintiff Firefighters or fraudulently induced them into an employment relationship. ECF No. 11-1 at 5–21; ECF No. 18 at 2–11. Plaintiffs' *Monell* claim under 42 U.S.C. § 1983, Defendant argues, cannot stand on its own without a plausible constitutional violation committed by a government employee. ECF No. 11-1 at 21; ECF No. 18 at 11–13. Defendants contend that Plaintiffs' state-law claims must be dismissed because their exclusive remedy for damages from workplace negligence is through the Maryland Workers' Compensation Act ("WCA"). ECF No. 11-1 at 21–25; ECF No. 18 at 13–15.

In their opposition, Plaintiffs argue that the intent-to-harm standard does not apply, that deliberate indifference is the level of culpability sufficient to sustain their state-created danger claim, and that they have alleged enough facts to plead fraud and deliberate indifference by the City amounting to a systemic due process violation under *Monell*. ECF No. 16 at 3–22. Plaintiffs argue that their state-law claims are not preempted by the WCA because they allege constitutional

violations, the statute only bars suits by "covered employees" and their "dependents," and the statute's exclusivity rule would unconstitutionally deny Plaintiffs a remedy. *Id.* at 22–30.

As it did in *Butrim I*, the Court shall grant Defendant's Motion to Dismiss. While the facts alleged in the Complaint are tragic and alarming, this Court is constrained by Fourth Circuit precedent to find them insufficient to state a plausible claim under § 1983 for a state-created danger violation of the Due Process Clause. Specifically, Plaintiffs fail to allege that the City took affirmative acts to create or increase a danger to Plaintiff Firefighters with the intent or purpose of harming them. And Plaintiffs do not allege sufficient facts to call for any lesser standard of culpability than intent to harm. Finally, Plaintiffs' state-law claims are plainly barred by the WCA and Maryland courts' interpretation of that statute. Because Plaintiffs fail to state any plausible claim for relief against the City, their Complaint must be dismissed.

### A. State-Created Danger

Count One of the Complaint asserts a claim against the City under 42 U.S.C. § 1983 and *Monell* for state-created danger in violation of Plaintiff Firefighters' substantive due process rights. Plaintiffs seek the reassert the same *Monell* claim this Court dismissed in *Butrim I* for their failure to plead an underlying constitutional violation.

#### 1. Legal Background

In the Memorandum Opinion, I summarized the legal principles that apply to Count One as follows:

> Title 42, United States Code, Section 1983 provides a right of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Thus, to sustain an action under § 1983, a plaintiff must demonstrate that: (1) he

suffered a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 45 n.3 (1988). "[A] viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Green v. Obsu*, Civ. No. ELH-19-2068, 2020 WL 758141, at *10 (D. Md. Feb. 13, 2020) (citations omitted).

The provision in the Fourteenth Amendment to the United States Constitution that "'[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law' . . . 'guarante[es] more than fair process[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (citations omitted). Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them[.]" *Id.* (citation omitted). The U.S. Supreme Court has explained that the concept of due process, at its core, is protection against arbitrary governmental action. *See id.* at 845; *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In cases involving "abusive executive action[,]" the Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). To establish a substantive due process violation based on executive action, the challenged conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citation omitted); *see also Waybright v. Frederick Cnty., Md.*, 528 F.3d 199, 205 (4th Cir. 2008) ("[T]he Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less.") (quoting *Lewis*, 523 U.S. at 846). "To be conscience shocking, a defendant's behavior must lack any reasonable justification in the service of a legitimate governmental objective.'" *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023) (quoting *Lewis*, 523 U.S. at 846).

11

Whether a government actor's conduct "shocks the conscience" turns on its degree of culpability. *Waybright*, 528 F.3d at 205; *see also Lewis*, 523 U.S. at 847 ("While the measure of what is conscience shocking is no calibrated yard stick, it does . . . 'poin[t] the way.'") (citation omitted). "For a due process challenge to executive action to succeed, the general rule is that the action must have been 'intended to injure in some way unjustifiable by any government interest.'" *Waybright*, 528 F.3d at 205 (quoting *Lewis*, 523 U.S. at 849). At the other end of the "culpability spectrum" lies "negligently inflicted harm," which is "categorically beneath the threshold of constitutional due process." *Id.* (quoting *Lewis*, 523 U.S. at 848–49). "[C]ulpability falling within the middle range" between intentionally and negligently inflicted harm "may have constitutional implications, but only in special circumstances." *Id.* (quoting *Lewis*, 523 U.S. at 849). Courts evaluating due process claims grounded in this middle range of the culpability spectrum "should proceed with 'self-restraint' and 'utmost care,' . . . and make 'an exact analysis' of the circumstances presented 'before any abuse of power is condemned as conscience shocking[.]'" *Id.* (quoting *Collins*, 503 U.S. at 125, and *Lewis*, 523 U.S. at 850).

In *Collins*, the Supreme Court affirmed dismissal of a § 1983 due process claim based on "the city's customar[y] fail[ure] to train or warn its employees about known hazards in the workplace[,]" which was alleged to have resulted in the death of a municipal employee. 503 U.S. at 117. The Court rejected the proposition that "the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Collins*, 503 U.S. at 126. More specifically, the Court rejected the notion "that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 128. In its analysis, the Court noted that the complaint did not charge the city with a "willful" violation of the decedent employee's rights and did not allege that the city or its agents "deliberately harmed" him. *Id.* at 125.

As a general matter, "the Due Process Clause does not require the State to provide its citizens with particular protective services," and "the State cannot be held liable for injuries that could

have been averted had it chosen to provide them." *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196–97 (1989)). There are two exceptions to this rule: (1) "when the individual and the state have a 'special relationship,' such as a custodial relationship, that gives rise to an affirmative duty to protect[;]" and (2) when a state actor takes "affirmative actions" that "create[] or enhance[] the dangerous conditions[,]" resulting in injury. *Id.* (citing *DeShaney*, 489 U.S. at 199–201, and *Pinder v. Johnson*, 54 F.3d 1169, 1176 (4th Cir. 1995) (en banc)). The latter exception is known as the "state-created danger" doctrine. *Id.*

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "[T]he state-created danger doctrine is narrowly drawn, and the bar for what constitutes an 'affirmative act' is high." *Turner*, 930 F.3d at 645 (citing *Pinder*, 54 F.3d at 1175). A government actor does not "create" a danger in "simply fail[ing] to provide adequate protection from it." *Pinder*, 54 F.3d at 1175. *See also Turner*, 930 F.3d at 646 (highlighting the difference between acts and omissions and warning against recasting omissions as acts).

In *Waybright v. Frederick Cnty., Md.*, the Fourth Circuit affirmed summary judgment in favor of the municipal defendants on the plaintiffs' due process claim based upon a fire department recruit's accidental death following an intensive physical training session. 528 F.3d at 208. As relevant here, the Fourth Circuit rejected the plaintiffs' contention that Waybright was in a "special relationship" with his supervisor such that the government had "a duty to act on [Waybright's] behalf and its failures to act [were] measured on a deliberate indifference standard[.]" *Id.* at 207. The court recognized that "a 'special relationship' is all but synonymous with a custodial relationship." *Id.* (citing *DeShaney*, 489 U.S. at 199–200). "The idea of a custodial relationship is a circumscribed one, grounded in the rationale *DeShaney* gives for it: '[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . .

it transgresses the substantive limits on state action. . . .'" *Id.* (quoting *DeShaney*, 489 U.S. at 200). Therefore, for a relationship to be considered custodial for due process purposes, there must be some sort of confinement, such as incarceration or institutionalization. *Id.* (citing *Pinder*, 54 F.3d at 1175). The special relationship doctrine did not apply because the decedent in *Waybright* was free to walk away from the training session and the job. *Id.*

Furthermore, the Fourth Circuit ruled that the state-created danger doctrine could not apply in light of the Supreme Court's holding in *Collins* that "due process does not impose a duty on municipalities to provide their employees with a safe workplace or warn them against risks of harm (though state tort law may)." *Id.* Applying the state-created danger doctrine in cases like *Waybright* would risk displacing state tort law with federal constitutional law "whenever an accident happens during activities sponsored by the state." *Id.* at 208. The court noted "immense" practical consequences of finding a state-created danger in such cases: "[Courts] might well inject federal authority into public school playground incidents, football (or even ballet) practice sessions, and class field trips, not to mention training sessions for government jobs that require some degree of physical fitness." *Id.*

The Fourth Circuit later applied *Collins* and *Waybright* in *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317 (4th Cir. 2012). In *Slaughter*, a fire department recruit, Racheal Wilson, died during a "live burn" training exercise. 682 F.3d at 319. Her survivors and estate brought an action against the Mayor and City Council of Baltimore under § 1983 alleging that the fire department violated Wilson's substantive due process rights by staging the exercise with deliberate indifference to her safety, "so as to shock the conscience." *Id.* Specifically, the plaintiffs alleged that Wilson's death could have been avoided with "adequate preparations," but the fire department willfully violated "nationally-recognized safety standards" and "created unduly dangerous conditions in staging the exercise." *Id.* at 320.

The Fourth Circuit affirmed dismissal of the complaint for failure to state a claim. Applying *Collins* and *Waybright*, the court held that the complaint "f[ell] short of alleging a substantive due

process violation" because it "d[id] not . . . allege that the Fire Department staged the live burn training exercise *with the purpose of causing harm to Wilson or to any other recruit*[.]" *Id.* at 319. The court recognized that the allegations may have been consistent with deliberate indifference, *id.* at 322, and may have supported a cause of action under state law, *id.* at 319. "But in the voluntary employment context," the plaintiffs did not allege "arbitrary (in the constitutional sense) or conscience-shocking conduct because they did not assert that the Fire Department *intended to harm* Wilson, as would be necessary to establish a substantive due process violation." *Id.* at 322 (citing *Collins*, 503 U.S. at 125–27 & n.10, and *Lewis*, 523 U.S. at 848–49). The Fourth Circuit ultimately held, in the context of this case, that the fire department's constitutional liability "turn[ed] on whether it *intended to harm* the new recruits." *Id.* at 323.

This intent-to-harm standard has been consistently applied by district courts in the Fourth Circuit. *See Est. of Cunningham v. Mayor & City Council of Baltimore*, 665 F. Supp. 3d 725, 736–37 (D. Md. 2023) (dismissing state-created danger claim where plaintiffs alleged that the defendants "deliberately chose not to repair or properly maintain" work environment and "deliberately chose not to train or inform" employees about safety policies, but plaintiffs did not plausibly allege an intent to harm); *Evans v. Maryland Nat'l Cap. Parks & Plan. Comm'n*, Civ. No. TDC-19-2651, 2020 WL 6703718, at *13–14 (D. Md. Nov. 13, 2020) (declining to dismiss substantive due process claim where plaintiffs plausibly alleged an intent to harm through repeated use of racial slurs, baseless and harassing investigations, unwarranted discipline, and an unjustified medical suspension). *Accord Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *15 (M.D.N.C. Mar. 25, 2020) ("Outside of the custodial context, government conduct normally does not shock the conscience (at least not in the constitutional sense) unless it was 'intended to injure in some way unjustifiable by any government interest'—a higher standard of fault than deliberate indifference."); *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 734–36 (D. Md. 2013) ("'[I]n the voluntary employment context,' the employee plaintiff must show that the governmental employer defendant '*intended to harm*' its employee in order to 'establish a substantive due process violation.'") (quoting *Slaughter*, 682 F.3d at 322) (emphasis in original)). In fact, given

15

the Fourth Circuit's consistently narrow reading of the state-created danger doctrine, that court noted in *Turner* that it has "never issued a published opinion recognizing a successful state-created danger claim." *Turner*, 930 F.3d at 646. This statement remains true today, to this Court's knowledge.

*Butrim I*, 2024 WL 5055196, at *4–6.

### 2. Analysis

The Court remains unpersuaded that Plaintiffs allege sufficient facts to remove this case from the "voluntary employment context" governed by the Fourth Circuit's holding in *Slaughter*. 682 F.3d at 322. Plaintiff Firefighters were employees of the City performing work within the scope of their employment at the time of the incident at issue in this case. Thus, in order to state a plausible state-created danger claim, Plaintiffs must allege not only that the City "created or increased the risk of private danger" to Plaintiff Firefighters "directly through affirmative acts, [and] not merely through inaction or omission[,]" *Rosa*, 795 F.3d at 439, but that the City took these affirmative acts with the intent to harm—that is, "*with the purpose of causing harm*" to— Plaintiff Firefighters, *Slaughter*, 682 F.3d at 319, 323.

Plaintiffs argue that they have sufficiently alleged affirmative conduct by the City that created or increased the risk of harm Plaintiff Firefighters. ECF No. 16 at 16. Specifically, the Complaint includes allegations that the City "deliberately" and "intentionally" discontinued the Code X-Ray program, Compl. ¶¶ 14, 22; failed to implement MOP 606-10, *id.* at 4–5; concealed "the cessation of [the] Code X-Ray program" by instructing those in charge to "not put in writing" that the City had "abandoned" it, *id.* ¶¶ 11, 13, 22; disseminated an email containing enforcement instructions for the program to all rank-and-file firefighters on January 5, 2012, continuing a false portrayal that the program was active after it had been quietly discontinued, *id.* ¶ 14; "instituted a policy not to demolish, mark, or track" condemned properties "at imminent risk of collapse," *id.* ¶

16

9; "withheld information" about the history and condition of the Property from the CAD system, Compl. at 3; and sent Plaintiff Firefighters into the Property on January 24, 2022, knowing that it had previously collapsed, remained structurally unsound, and would have been visibly marked as such if the Code X-Ray program had not been terminated, *id.* ¶¶ 15, 34–35, 40.

In cases alleging a state-created danger, the Court must be wary of attempts by plaintiffs to recast a government actor's omissions as "affirmative acts" through artful pleading. *See Rosa*, 795 F.3d at 441 (quoting *Pinder*, 54 F.3d at 1176 n.*) ("[A]lthough 'inaction can often be artfully recharacterized as "action," courts should resist the temptation to inject this alternate framework into omission cases."). Furthermore, "in the state-created danger context," the concept of "affirmative acts" is "quite limited in scope" and "should not extend 'beyond the context of immediate interactions between the [state actor] and the plaintiff.'" *Id.* (quoting *Pinder*, 54 F.3d at 1176 n.*). It is clear that a City or BFD official sending Plaintiff Firefighters inside the Property to combat the fire on January 24, 2022, with knowledge of the Property's history and status would constitute an affirmative act directed toward Plaintiff Firefighters. But several of the other "affirmative acts" ascribed to the City in the Complaint are actually omissions or acts that do not involve any "immediate interactions" between a City or BFD official and Plaintiff Firefighters that created or increased any danger to the firefighters. *Id.* The Complaint leaves entirely unclear, for example, whether any of the Plaintiff Firefighters received the January 2012 email falsely portraying that the Code X-Ray program remained in force.[3]

But even if all the foregoing acts attributed to the City constituted "affirmative acts" for purposes of a state-created danger claim, Plaintiffs do not allege any facts to support a reasonable

---

[3] In an affidavit attached to the Complaint, plaintiff John McMaster states that he joined BFD in September 2015, more than four years after the email was sent, ECF 7-1, and the Complaint does not state when the other Plaintiff Firefighters joined BFD.

inference that any City or BFD official, at any point, acted "*with the purpose of*" harming Plaintiff Firefighters. *Slaughter*, 682 F.3d at 319. Plaintiffs allege in broad terms that the City acted "with the intent to injure" or "harm" Plaintiff Firefighters, Compl. at 3, but they offer no facts to support these conclusory and formulaic allegations. Such "naked assertions" lacking "factual enhancement" are plainly inadequate to sustain Plaintiffs' claim. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).[4]

As the Court explained in *Butrim I*:

> The only plausible purpose for sending Plaintiff Firefighters into the Property supported by the facts in the Complaint was to fight the fire that engulfed the building. The only facts offered that speak to the City's motivations in failing to mark the Property as structurally compromised concern the City's agreement with the Southwest Partnership, a nonprofit community organization. . . . .Plaintiffs allege . . . that this agreement caused the City to avoid marking certain compromised properties because the markings would make them unattractive to potential investors. . . . Accepting these allegations as true—and accepting that they may describe wrongful or even egregious conduct by Defendant—the Court does not find that the allegations support a reasonable inference that Defendant acted with the purpose of causing harm to Plaintiff Firefighters. *See Slaughter*, 682 F.3d at 323 (finding no constitutional liability for a state-created danger where facts in the complaint did not support the conclusion that the fire department "*intended to harm*" employees); *Cunningham*, 665 F. Supp. 3d at 737 (dismissing state-created danger claim where plaintiffs' allegations describe "negligent, or even egregious, conduct by the City Defendants" but "do not show that the City Defendants intended to harm [decedent]"). Therefore,

---

[4] Plaintiffs' reference to "the natural and logical consequences" of the City's deliberate acts, Compl. at 4, cannot sustain their bare assertion of the City's intent to injure Plaintiff Firefighters and falls short of alleging that the City acted with the purpose of causing harm. *See Slaughter*, 682 F.3d at 319 (complaint "f[ell] short of alleging a substantive due process violation" because it "d[id] not . . . allege that the Fire Department staged the live burn training exercise *with the purpose of causing harm to Wilson or to any other recruit*"); *Cunningham*, 665 F. Supp. 3d at 737 n.3 (rejecting plaintiffs' argument that "the City Defendants' intent to harm Ms. Cunningham can be measured by the natural and probable consequences of their actions").

> the Complaint fails to state a plausible claim under § 1983 for a
> state-created danger in violation of the Due Process Clause.

2024 WL 5055196, at *8.

Notably, in their opposition, Plaintiffs do not argue that they adequately alleged any City or BFD official's intent to harm Plaintiff Firefighters; they argue instead that *Slaughter*'s intent-to-harm standard does not apply to this case and, in any event, *Slaughter* was wrongly decided. *See* ECF No. 16 at 9–15. The latter point is a non-starter. The majority decision in *Slaughter* remains good law in this Circuit and is binding on this Court. In that case, the Fourth Circuit applied Supreme Court precedent in specifically rejecting the argument Plaintiffs press here: that deliberate indifference by a governmental entity toward its employees can amount to arbitrary or conscious-shocking conduct in violation of substantive due process. *See Slaughter*, 682 F.3d at 321–22 (citing *Collins*, 503 U.S. at 128).

Plaintiffs argue that a standard less than intent to harm applies to this case on account of the City's allegedly deceptive conduct, which, Plaintiffs contend, fraudulently induced Plaintiff Firefighters into an employment relationship[5] and effectively removes this case from the "voluntary employment context" governed by *Slaughter*, 682 F.3d at 322. ECF No. 16 at 1–4, 10–13. Specifically, Plaintiffs allege that the City intentionally misrepresented that Code X-Ray was still in effect after the program's discontinuation, which misled Plaintiff Firefighters about a

---

[5] The elements of fraudulent inducement are as follows:

> (1) a material representation of a party was false; (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him; (3) the misrepresentation was made with the purpose to defraud (scienter); (4) the person justifiably relied on the misrepresentation; and (5) the person suffered damage directly resulting from the misrepresentation.

*Airport Square Holdings, LLC v. GCCFC 2007-GG9 Colomary Facilities, LLC*, Civ. No. JFM-16-02883, 2017 WL 639230, at *6 (D. Md. Feb. 16, 2017) (citing *Lawley v. Northam*, Civ. No. ELH-10-1074, 2011 WL 6013279, at *9 (D. Md. Dec. 1, 2011)).

material term of their employment and rendered their "exposure to enhanced life-threatening risks unwitting rather than voluntary." *Id.* at 4. Plaintiffs claim the City's misrepresentation as to the status of the Code X-Ray program makes this case "unique" and unlike *Slaughter* in that it undermines the voluntariness of Plaintiff Firefighters' employment. *Id.* at 10.

As explained in *Butrim I*, however, Federal Rule of Civil Procedure 9(b) requires plaintiffs alleging fraud to state "with particularity the circumstances" constituting the fraud. "Rule 9(b) applies . . . to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001). Here, Plaintiffs allege fraudulent inducement in support of their state-created danger claim. Therefore, the pleading standard of Rule 9(b) applies to that allegation.

"The standard set forth by Rule 9(b) aims to provide defendants with fair notice of claims against them and the factual ground upon which they are based, forestall frivolous suits, prevent fraud actions in which all the facts are learned only following discovery, and protect defendants' goodwill and reputation." *McCauley*, 710 F.3d at 559 (citation omitted); *see also Woodrow v. Vericrest Fin., Inc.*, Civ. No. AW-09-1612, 2009 WL 4348594, at *5 (D. Md. Nov. 30, 2009).

> "[I]f particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003); *see also Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 945 (7th Cir. 2024) ("[I]f a court thinks a plaintiff has failed to plead fraud, it must 'disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.'") (quoting *Lone Star Ladies Inv. Club*, 238 F.3d at 368[)].

*Butrim I*, 2024 WL 5055196, at *8.

Accordingly, Plaintiffs' allegations that the City misrepresented the status of the Code X-Ray program and engaged in other forms of deception toward Plaintiff Firefighters require pleading with particularity "the time, place, and contents of the false representations." *McCauley*, 710 F.3d at 559. *See also Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 15 F.3d 327, 331 (4th Cir. 1994) (affirming dismissal of fraudulent inducement claim for failure to plead with particularity); *Campbell v. Indymac Bank, FSB*, Civ. No. CCB-09-3182, 2010 WL 419387, at *3 (D. Md. Jan. 29, 2010) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir.1999)) ("[A]s intentional misrepresentation is a claim based in fraud, it is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).").

The closest Plaintiffs come to alleging the City's fraud with particularity is by reference to the affidavit of plaintiff John McMaster, dated January 21, 2025, which is attached as an exhibit to the Complaint. ECF No. 7-1; *see also* Compl. at 4. In that affidavit, McMaster affirms that he was employed with BFD as a firefighter between 2015 and 2022 and, during that period of employment, "[t]he City maintained at all relevant times that the Code X-Ray program was in full effect." ECF No. 7-1. McMaster further affirms the following:

> [T]he City repeatedly assured [firefighters] that it created a program called Code X-Ray, under which the City would conspicuously mark any structurally compromised buildings in the Mount Clare neighborhood to ensure that we would not enter inside unknowingly and be exposed to the near-certain risk of injury or death from a collapse. The City further assured [firefighters] that it would catalog and store these properties in the CAD system as a failsafe to ensure that even if a property was not marked, [firefighters] would know not to enter.

*Id.* ¶ 4. The statements in McMaster's January 2025 affidavit fall short of the particularity required by Rule 9(b). The affidavit leaves unclear the circumstances in which the City's allegedly false assurances were conveyed to McMaster or any other firefighter, such as the place or approximate

point in time in which the statements were made and the person who made them.[6,7] *See McCauley*,

710 F.3d at 559.

Plaintiffs' reliance upon the decision of the U.S. District Court for the District of Columbia

in *Briscoe v. Potter*, 355 F. Supp. 2d 30 (D.D.C. 2004), is unavailing. In *Briscoe*, postal employees

brought an action against specific United States Postal Service ("USPS") officials pursuant to

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). The

plaintiff postal workers alleged procedural and substantive due process violations, including a

---

[6] I note that Plaintiffs attach a second affidavit from McMaster to their opposition (dated May 12, 2025) that includes some of these details, ECF 16-3, along with affidavits from two other former BFD employees that provide detail about the City's alleged misrepresentations, ECF 16-1 & 16-2. The Court declines to consider these affidavits in assessing the sufficiency of the Complaint on a Rule 12(b)(6) motion to dismiss. It is well established that a court may consider materials attached to a complaint or incorporated into a complaint by reference, like McMaster's first affidavit. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). But is equally clear that a plaintiff cannot seek to amend his pleading through materials submitted in opposition to a motion to dismiss. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013) (citation omitted); *Lindsey-Grobes v. United Airlines, Inc.*, Civ. No. GJH-14-00857, 2014 WL 5298030, at *5 (D. Md. Oct. 14, 2014) (citing cases). Because McMaster's second affidavit and the several other affidavits attached to Plaintiffs' opposition are neither attached to, nor referenced in, the Complaint, I decline to consider them. However, Plaintiffs shall have an opportunity to file a motion for leave to amend their pleading, which will give them an opportunity attach any additional materials they deem necessary to state their claims.

[7] Plaintiffs argue that they need not identify individual government actors involved in the alleged fraudulent conduct because the City is a "corporate defendant." ECF No. 16 at 18 (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 790–92 (4th Cir. 1999); *see also Mayor of Balt. v. Unisys Corp.*, Civ. No. 12-614-JKB, 2012 WL 3561850, at *6 (D. Md. Aug. 16, 2012) (citing cases) ("Courts in this Circuit have previously found . . . that where a misrepresentation is attributed to a corporate defendant, the Plaintiff does not necessarily have to identify the individual agent who made the alleged false statement."). But, here, Plaintiffs' *Monell* claim against the City as a "municipal corporation" relies upon constitutional violations by individual municipal officials or employees. *See Giancola v. State of W.Va. Dep't of Pub. Safety*, 830 F.2d 547, 550 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 690–92) ("[T]o establish liability on behalf of the entity, it must be shown that the actions of the officers were unconstitutional and were taken pursuant to a custom or policy of the entity."); *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999), *abrogated on other grounds by Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) ("As there are no underlying constitutional violations by any individual, there can be no municipal liability."); *Anderson v. Caldwell Cnty. Sheriff's Off.*, 524 F. App'x 854, 862 (4th Cir. 2013) (citing *Heller* and *Giancola*) ("No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee."). If a constitutional violation by a municipal official was effected through fraud and deception, I find that the pleading requirements of Rule 9(b) require Plaintiffs to identify the individual officials who made the allegedly false representations, whether by name or by description. Plaintiffs fail to do that in their Complaint.

claim that "misleading and/or false information" conveyed by the defendant USPS officials deprived the plaintiffs of their "substantive due process liberty interest in a safe work environment free from needless danger." 355 F. Supp. 2d at 37 (citation omitted). The plaintiffs further alleged that the defendants "engaged in a campaign of misinformation designed to keep . . . employees at work" despite being put on notice that the facility where the plaintiffs worked "was contaminated with anthrax." *Id.* at 31, 46 (citation omitted). Though the court ultimately dismissed plaintiffs' substantive due process claim under the qualified immunity doctrine, it "f[ound] that [p]laintiffs ha[d] sufficiently alleged that [d]efendants' conduct amounted to deliberate indifference, which violated their substantive due-process rights under the [s]tate [e]ndangerment theory." *Id.* at 46.

However, in stark contrast with the Complaint in the instant case, the complaint in *Briscoe* went into detail about specific misrepresentations made by specific USPS officials to the plaintiff employees and to the general public on specific dates. *Id.* at 33–36.[8] In addition, unlike Plaintiffs here, the *Briscoe* plaintiffs alleged that they were "threaten[ed], intimidat[ed], and/or coerc[ed]" to continue working under unsafe conditions, *id.* at 46, and their complaint outlined the defendants' threats and intimidation in detail, *see id.* at 33–36. Moreover, the *Briscoe* court found that the plaintiffs were "not seeking . . . redress based on defendants' failure to protect them from a hazard that was 'inherent' in their occupation," noting that "potential exposure to anthrax is not a danger that one would reasonably anticipate when accepting employment at a post office." *Id.* at 46–47. In contrast, the danger at issue here—the collapse of a vacant building during a fire—was a hazard at least arguably inherent to Plaintiff Firefighters' occupation and could be reasonably anticipated

---

[8] Plaintiffs point out that Federal Rule of Civil Procedure 9 was not raised or mentioned in *Briscoe* and argue that "in a § 1983 action, a municipal employee plaintiff satisfies Rule 8(a) by alleging an intentional misrepresentation that forms the basis for the constitutional violation." ECF No. 16 at 11. I disagree. There is a likelihood that the pleading requirements of Rule 9(b) were not addressed in *Briscoe* because the complaint in that case clearly satisfied them.

when they accepted and maintained employment with BFD. *See Martinez v. Fed. Home Loan Mortg. Corp.*, 943 F. Supp. 280, 284 (S.D.N.Y. 1996) ("[T]he weakening and the collapse of a burning structure are particular risks which firefighters assume as part of their profession."). Finally, unlike this Court, the *Briscoe* court was not bound by Fourth Circuit precedent, and the Fourth Circuit's decision in *Slaughter* had not issued at the time of the *Briscoe* decision.

Plaintiffs also liken the instant case to *Washington v. Housing Authority of the City of Columbia*, a Fourth Circuit case wherein the personal representative of the estate of a deceased tenant sued a municipal housing authority under § 1983 for violating the tenant's substantive due process rights by failing to regularly inspect or install carbon monoxide detectors in its property. 58 F.4th at 175–76. The Fourth Circuit held that the deliberate indifference standard is correctly applied when officials have had "time to 'reflect on [their] actions'" such that "actual deliberation is practical." *Id.* at 178 (quoting *Dean*, 976 F.3d at 415). In *Washington*, the plaintiff sufficiently alleged that the defendant acted with deliberate indifference, "thereby violating [the deceased tenant's] substantive-due-process rights." *Id.* at 182. Critically, however, the tenant's relationship with the housing authority was not the "voluntary employment relationship" controlled by the Fourth Circuit's holding in *Slaughter*, 682 F.3d at 322. *See also Waybright*, 528 F.3d at 206 (citing *Collins*, 503 U.S. 115) (concluding that the Supreme Court in *Collins* "necessarily rejected the time to deliberate theory" when declining to apply the deliberate indifference standard in the context of government employment). *Slaughter* is the controlling authority here—not *Washington*.

In sum, I find that the Complaint does not contain enough facts to support any plausible claim against the City for state-created danger in violation of the Due Process Clause. "Ultimately, the applicable standard of culpability for a substantive-due-process claim—either 'intent to harm' or 'deliberate indifference'—depends on 'an exact analysis of [the] context and circumstances' of

24

the case." *Washington*, 58 F.4th at 178 (quoting *Dean*, 976 F.3d at 414). And the state-created danger doctrine is a "narrowly drawn" doctrine, *Turner*, 930 F.3d at 645, particularly in the employment context, *see Slaughter*, 682 F.3d at 322. Plaintiffs do not allege that Plaintiff Firefighters were coerced into employment with the City, that they were threatened into maintaining employment as firefighters, or that they were subjected to confinement by the City. *See Slaughter*, 682 F.3d at 322 (quoting *Waybright*, 528 F.3d at 207) (noting that, in *Waybright*, plaintiff fire department recruit "was not in government custody, but could 'walk away' from . . . the job"). Plaintiffs allege that the City lied to Plaintiff Firefighters and fraudulently induced them into an employment relationship, but they fail to state the circumstances of the City's deceptive statements and fraudulent inducement with the particularity required by Rule 9(b). "[W]ithout the factual enhancement necessary to sustain the allegation that Defendant lied to Plaintiff Firefighters, the Court cannot determine whether this case presents 'special circumstances' to support a finding that Defendant's intermediate level of culpability has 'constitutional implications[.]'" *Butrim I*, 2024 WL 5055196, at *8 n.3 (quoting *Waybright*, 528 F.3d at 205). Setting aside Plaintiffs' unsupported claim that Plaintiff Firefighters were fraudulently induced into employment, "*Slaughter*'s intent-to-harm standard clearly applies to Plaintiffs' state-created danger claim." *Id.* at *8. And because, as explained *supra*, Plaintiffs fail to allege facts to support a reasonable inference that the City intended to injure Plaintiff Firefighters or acted "*with the purpose of causing harm*" to them, *Slaughter*, 682 F.3d at 319, 323, they fail to state a plausible claim for state-created danger in violation of the Due Process Clause. Without a plausible constitutional violation by any City official or employee, Plaintiffs' *Monell* claim cannot survive Defendant's Motion to Dismiss. *See Giancola*, 830 F.2d at 550 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 690–92) ("[T]o establish liability on behalf of the entity, it must be shown that the actions of the officers were

unconstitutional and were taken pursuant to a custom or policy of the entity."); *Anderson*, 524 F. App'x at 862 (citing *Heller* and *Giancola*); *Johnson v. Balt. Police Dep't*, 500 F. Supp. 3d 454, 459–60 (D. Md. 2020) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001)) ("[A] *Monell* claim cannot lie 'where there is no underlying constitutional violation by the employee.'").

### B.  State-Law Claims

Counts Two through Four of the Complaint assert claims against the City under state law. Count Two is a negligence claim against the City by McMaster, and Counts Three and Four are survival and wrongful death claims by the Estates of Butrim, Sadler, and Lacayo. Defendant argues that these claims are barred by Maryland's workers' compensation statute, the WCA.

The WCA "protect[s] workers and their families from hardships inflicted by accidental work-related injuries and occupational diseases." *Matter of Collins*, 228 A.3d 760, 767 (Md. 2020) (citation omitted); *see also* Md. Code Ann., Lab. & Empl. §§ 9-101 *et seq*. Under the Act, "an employer is generally required to pay workers' compensation benefits to an employee who suffers an accidental personal injury in the course of employment, regardless of whether the employer is at fault for the injury." *Buitron v. Tractor Supply Co.*, 723 F. Supp. 3d 428, 432 (D. Md. 2024) (quoting *Ledford v. Jenway Contracting, Inc.*, 305 A.3d 498, 503 (Md. App. 2023), *aff'd*, 338 A.3d 563, 583 (Md. 2025)). The WCA also requires employers to compensate dependents of employees covered by the Act where those employees' deaths were the result of an accidental personal injury sustained "in the course of employment." *Morris v. Bd. of Educ. of Prince George's Cnty.*, 663 A.2d 578, 580 (Md. 1995) (quoting Md. Code Ann., Lab. & Empl. §§ 9-101(b)(1), 9-501(a)).

Importantly, "[c]ompensation awarded on this fault-free basis under the statutory plan substitutes for an employee's common law right to bring a fault-based tort suit against an employer

for damages resulting from the employee's injury or disablement on the job." *Matter of Collins*, 228 A.3d at 767–68 (quoting *DeBusk v. Johns Hopkins Hosp.*, 677 A.2d 73, 75 (Md. 1996)); *see also* Md. Code Ann., Lab. & Empl. § 9-509(a) ("Except as otherwise provided in this title, the liability of an employer under this title is exclusive."); *id.* § 9-509(b) ("Except as otherwise provided in this title, the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person."). This rule of exclusivity serves to "protect employers from the unpredictable nature and expense of litigation, and the public from the overwhelming tax burden of 'caring for the helpless human wreckage found [along] the trail of modern industry.'" *Polomski v. Mayor of Balt.*, 684 A.2d 1338, 1341 (Md. 1996) (citations omitted). "Compensation under the WCA is an employee's [or dependent's] exclusive remedy *unless* the injury is shown to be the result of 'the deliberate intent of the employer to injure or kill the covered employee.'" *Tynes v. Shoney's Inc.*, 867 F. Supp. 330, 332 (D. Md. 1994) (emphasis added) (quoting Md. Code Ann., Lab. & Empl. § 9-509(d)). In other words, a plaintiff's "complaint must be based upon allegations of an intentional or deliberate act by the employer *with a desire to bring about the consequences of the act.*" *Johnson v. Mountaire Farms of Delmarva, Inc.*, 503 A.2d 708, 712 (Md. 1986). If such is shown, the employee or their dependents may "file [a] claim under the WCA or bring a common law tort action for damages." *Id.*

Plaintiffs' negligence and survival claims under Maryland law are plainly proscribed by the WCA. As explained in Part III.A *supra*, the Complaint falls short of alleging any "deliberate intent of the employer to injure or kill" Plaintiff Firefighters. Md. Code Ann., Lab. & Empl. § 9-509(d). Therefore, compensation through the WCA provides Plaintiff Firefighters and their dependents an exclusive remedy "in place of any right of action against" the employer, Md. Code

27

Ann., Lab. & Empl. § 9-509(b), and the employer's liability under the WCA is "exclusive[,]" *id.* § 9-509(a).

Plaintiffs cite no authority to support their argument that the WCA only bars suits by "covered employees" and their dependents, and does not bar wrongful death suits by non-dependents. The Supreme Court of Maryland has rejected this argument, holding as recently as last year that "the exclusivity provision protects compliant employers from outside liability for a covered employee's injury or death, regardless of the identity of the party bringing suit." *Ledford v. Jenway Contracting, Inc.*, 338 A.3d 563, 583 (Md. 2025); *see also Ledford*, 305 A.3d at 508 (finding that "the [General Assembly] did not intend to limit the Act's exclusivity provision to covered employees and their dependents," and that "the Act was exclusive to dependents and non-dependents alike."). Accordingly, in *Ledford*, the exclusivity rule "foreclose[d] a wrongful death action from a non-dependent child of a deceased covered employee." 338 A.3d at 583.

In the same case, the court also rejected Plaintiffs' argument that allowing the WCA's exclusivity provision to bar wrongful death claims of non-dependent adults violates Article 19 of the Maryland Declaration of Rights. The plaintiff in *Ledford* likewise argued that allowing the Act's exclusivity provision to bar her wrongful death claim "would deny an entire class of persons access to the courts, and [a] remedy for [an] injury, as guaranteed by [Article 19.]" *Id.* at 570 (internal quotation marks omitted). Article 19 provides "[t]hat every [person], for any injury done to [them] in [their] person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land." Md. Const. Declaration of Rts., art. 19. The Supreme Court of Maryland "has interpreted Article 19 as protecting 'two interrelated rights: (1) a right to a remedy for an injury to one's person or property; [and] (2) a right of access to the

courts.'" *Ledford*, 338 A.3d at 583–84 (quoting *Piselli v. 75th St. Med.*, 808 A.2d 508, 518 (Md. 2002)). Though "Article 19 'generally prohibits unreasonable restrictions upon . . . traditional remedies or . . . access to the courts,'" the Maryland General Assembly is still allowed, "pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts." *Id.* at 584 (quoting *Piselli*, 808 A.2d at 518).

After surveying the history of the WCA and noting that "non-dependent children in Maryland have never enjoyed the right to sue their parent's employer for damages arising from a workplace accident resulting in death," the *Ledford* court held that the plaintiff's desired remedy was "not a traditional remedy" in Maryland and therefore "[wa]s not protected by Article 19." *Id.* at 586 (citing *Piselli*, 808 A.2d at 519). Plaintiffs acknowledge that at the time of the adoption of the WCA, "parents of adult children did not have the right to sue for wrongful death," and, in 1999, the right was only extended to non-dependent adult children. ECF No. 16 at 27–28. As such, the remedy sought by non-dependent Plaintiffs Butrim, Lacayo, and Norman is not a "traditional remedy" protected by Article 19. Given that this remedy was not available to parents and children before the adoption of the Act, it is implausible that such a remedy would have been available to siblings. Plaintiffs do not cite any Maryland case to support the proposition that a wrongful death action against their child's or sibling's employer for their relatives' work-related deaths is a "traditional remedy" in Maryland or is otherwise protected by Article 19. "Moreover, it would be unreasonable to subject compliant employers to suit from non-dependent relatives of deceased covered employees when the employers have otherwise been assured that their liability is limited to the confines of the Act." *Id.* at 587. Because the exclusivity clause was designed to prevent "double recovery," allowing non-dependent Plaintiffs to pursue their wrongful death claims "would render [compliant employers'] immunity effectively meaningless . . . , which, in addition

to being unreasonable, . . . would undermine the fundamental framework of the Act." *Id.* at 578–79, 587.

Accordingly, Plaintiffs' claims under Maryland law must be dismissed.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss will be GRANTED. The Complaint shall be dismissed without prejudice.

A separate Order will follow.


  2/20/26                                    /S/
Date                                    Matthew J. Maddox
                                    United States District Judge